# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **SAFETY NATIONAL CASUALTY** | § | |
| **CORPORATION and** | § | |
| **AAA BONDING AGENCY, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | **CIVIL ACTION NO. H-05-cv-2159** |
| | § | |
| **v.** | § | |
| | § | |
| **UNITED STATES DEPARTMENT OF** | § | |
| **HOMELAND SECURITY**, *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court are the parties' Cross Motions for Summary Judgment. After considering the relevant law and the arguments presented in briefing and at a hearing on the pending motions, the Court finds that Plaintiffs' Motion for Partial Summary Judgment, Docket No. 88, should be **GRANTED IN PART** because Defendants' determination that certain bonds were breached was arbitrary and capricious. These bond breach determinations are therefore **REMANDED** to the Agency to take action not inconsistent with this Order. Plaintiffs' Motion is also **GRANTED IN PART** as to certain bonds that were settled; Defendants cannot, therefore, prevail on their counterclaim with regard to these bonds.

Defendants' Motion, Docket No. 86, is **GRANTED IN PART** because Defendants' determination that certain bonds were breached was not arbitrary and capricious. Payment is therefore due on these bonds in accordance with the terms of the Alternative Dispute Resolution Agreed Framework, Docket No. 27.

The Court further finds that certain bonds that were cancelled are now **MOOT.**

## I.     BACKGROUND

### A.     Procedural Posture

1

This lawsuit involves a bitter dispute between Safety National Casualty Corporation (Safety National), a surety company authorized by the Department of Treasury to issue immigration delivery bonds, AAA Bonding Agency, Inc. (AAA), Safety National's authorized agent, and the Department of Homeland Security (DHS), regarding more than 1400 immigration bond breach determinations.  An alien may use an immigration delivery bond to procure his release from the custody of DHS's Bureau of Immigration and Customs Enforcement (ICE) pending the outcome of deportation proceedings against him.   As discussed below, an immigration delivery bond is a contract, akin to a bail bond, between Safety National—acting through its agent AAA—and DHS.

Plaintiffs contend that DHS has failed to follow the terms of the bond contract and the relevant regulations and statutes when determining that the immigration bonds at issue were breached.  Specifically, Plaintiffs claim that DHS has demanded payment of bonds that were not actually breached or to which they have asserted valid defenses, and that DHS has refused to comply with valid requests for information made pursuant to the Freedom of Information Act (FOIA).  Plaintiffs' Complaint sought declaratory and injunctive relief, including offsets and credits, for amounts due under the breached immigration bonds.  Plaintiffs also pled a claim under the Freedom of Information Act, 5 U.S.C. § 552, demanding documents they had requested from DHS regarding the bonds at issue.  Defendants counterclaimed against Plaintiffs for $9,255,750 in penal amounts plus interest, penalties and handling charges for outstanding breached bonds.  Defendants also filed a motion to dismiss all counts except for those claims brought under the Administrative Procedures  Act, 5 U.S.C. § 701 *et seq.* (APA).

Shortly after this lawsuit was filed, DHS informed Plaintiffs of its decision to unilaterally prohibit Safety National from writing any further immigration bonds.  The Court subsequently enjoined DHS from refusing to accept bonds issued by Safety National, finding, *inter alia*, that

Safety National had established a substantial likelihood of prevailing on the merits of its claim

that DHS lacked inherent authority to refuse all bonds issued by a particular surety and on its due

process claims.[1]  (Docket No. 35.)

The parties subsequently entered into an Agreed Framework for Alternative Dispute

Resolution (ADR Agreement) that was approved by the Court on September 14, 2005.  (Docket

No. 27.)  Pursuant to the ADR Agreement, which was prepared by Defendants, parties agreed to

jointly review 50 bond breach determinations—25 selected by Plaintiffs, and 25 selected by

Defendants.  Defendants agreed to produce a copy of the full Alien file ("A-file") to Plaintiffs for

each of these 50 bonds "exclusive of any privileged or otherwise protected documents."  The

parties also agreed to "review the 50 files produced and identify any and all potential defenses to

payment found in the selected files" and to "compile a list of all such potential defenses found in

those files."  The parties were then to agree to a "general description or brief statement of facts

that illustrates the purported defense," and mutually confer and decide whether any of the 50

bond determinations should be rescinded and/or the bond cancelled or whether the breach

determination should stand.  Plaintiffs agreed to immediately pay the outstanding debt owing

from a determination that a selected breach should stand.  The ADR Agreement concluded:

> Any selected breach determinations as to which the parties cannot agree whether
> there exists a valid defense to payment will be presented to the Court for
> resolution, with a copy of the corresponding file produced to Plaintiffs and the
> general description or statement of facts for the purported defense, as cross
> motions for summary judgment or using another mutually agreed-upon method.
> The Court's ruling on any such determinations shall be binding only with regard
> to the rescission or payment of the selected determinations.

The Court also agreed to the Parties' joint request that it refrain from deciding Defendants'

pending Motion to Dismiss until the conclusion of the ADR proceedings.  The Motion to

---

[1] Upon complaint by DHS, the Department of Treasury subsequently decided to revoke Safety National's certificate
of authority to write bonds pursuant to 31 U.S.C. § 9305 and 31 C.F.R. § 223.18.  Safety National's lawsuit
challenging that decision is also currently before the Court.

Dismiss was denied without prejudice to refiling "at the conclusion of those proceedings."  (Doc. No. 37.)

Any hope that the ADR Agreement might substantially assist the parties in resolving their differences was dampened when parties later became engaged in a protracted battle over Defendants' refusal to release more than 2,000 pages of documents related to the 50 bonds based on claims of privilege.[2]  The Court compelled the production of those documents over the protest of Defendants.  Defendants sought mandamus as to that decision, and the Fifth Circuit ordered the Court to review the documents *in camera* to determine whether any were protected by the law enforcement privilege.  The parties, however, never asked the Court to do so.  A year after the Court approved the ADR Agreement, parties entered into an Agreed Protective Order and Defendants finally produced the remaining redacted documents to Plaintiffs.  The parties then agreed to a stipulated Joint Statement of Facts (JSOF) for each of the 50 bond breach determinations and compiled a Joint Appendix of the documents referenced in the JSOF. Plaintiffs also identified thirteen defenses they claim are applicable to one or more of the 50 bonds and provided a list of those defenses to Defendants.

The ADR process had some limited success.  Defendants agreed to cancel six of the bond breach determinations,[3] and Plaintiffs now concede that one of the bonds was properly declared breached.[4]  Of the remaining 43 bonds, DHS conceded that two invoices were not enforceable, and remanded those breach determinations to the agency for further proceedings,[5] leaving 41 bond breach determinations for the Court to consider.

---

[2] Defendants had already released approximately 4,000 pages of documents to Plaintiffs.
[3] JSOF 2, 5, 23, 26, 36, and 46.
[4] JSOF 30.
[5] JSOF 48, 50.  The bond discussed at JSOF 47 was still on appeal at the time of the ADR process, but has since been decided.  Defendants claim, and Plaintiffs have not disputed, that this bond breach determination is now properly before the Court.

As agreed, Parties have provided the JSOF and the Joint Appendix to the Court, subject to the parties' "right to object to the relevance or admissibility of any document included herein." (Doc. No. 83.)   The Court is therefore prepared to rule on the remaining 41 bond breach determinations.

### B.    Relevant Statutory and Regulatory Background

The Bureau of Immigration and Customs Enforcement (ICE) is responsible for the apprehension and detention of inadmissible and deportable aliens.  8 U.S.C. § 1103(a); 8 C.F.R. Part 236.  An alien detained by ICE may be released from custody during removal proceedings under certain circumstances.  8 C.F.R. § 236.1(c).  The Secretary of Homeland Security is authorized to "prescribe such forms of bond" as he deems necessary to carry out his authority.  8 U.S.C. § 1103(a)(3).

An alien may post a cash or surety bond for his release from custody on form I-352 (the Bond Contract).  8 C.F.R. § 103.6.  Given the exceptionally poor draftsmanship reflected in this document, it is perhaps unsurprising that its requirements and conditions are subject to dispute. The delivery bond is issued to guarantee the appearance of an alien for deportation and at hearings in exclusion proceedings.   According to the Bond Contract, "[a] delivery bond is breached when in response to a timely demand, the obligor either [sic] fails to produce the alien at the location specified in that demand."  I-352, General Terms and Conditions.  The Bond Contract further specifies that the bond obligation is terminated if the obligor produces or causes the alien to be produced as specified in the appearance notice "upon each and every written request until exclusion/deportation/removal proceedings" are terminated, if the alien is accepted by ICE for detention or deportation/removal, or if the bond is "otherwise cancelled."  I-352(G)(1).  The General Terms and Conditions section of the I-352 lists a number of specific events that lead to automatic cancellation of a bond if they occur prior to the date of the breach.

"[O]ther circumstances as provided by statute or regulation" are also listed as a reason for cancellation of a bond.  *Id.*  If the obligor "fails to surrender the alien in response to a timely demand while the bond remains in effect, the full amount of the bond . . . becomes due and payable."  I-352(G)(1).

The relevant regulations clarify that a bond  is breached "when there has been a substantial violation of the stipulated conditions."  8 C.F.R. § 103.6(e).  "Substantial performance of all conditions imposed by the terms of a bond shall release the obligor from liability."  8 C.F.R. § 103.6(c)(3).

 Notice of a demand to surrender an alien is sent to the bonding company on an I-340 "Notice to Deliver Alien" form, which sets forth the date, time and place the alien needs to appear.  (*See, e.g.*, Jt. Appx. 0003.)  If the alien fails to appear, and the ICE Field Office Director finds a substantial violation of the terms of the bond has occurred, the bond is deemed breached. DHS must send notice of the breach and the reasons for the breach to the surety, which is usually done on a Form I-323.  8 C.F.R. §103.6 (e) ("The district director having custody of the file . . . shall determine whether the bond shall be declared breached or cancelled and shall notify the obligor on Form I-323 or Form I-391 of the decision, and, if declared breached, of the reasons therefor, and of the right to appeal . . . .");  I-352, General Terms and Conditions.

The surety has 30 days to file an administrative appeal or motion for reconsideration of the breach.  I-352, General Terms and Conditions; 8 C.F.R. § 103.5, 8 C.F.R. § 103.3(a)(2)(i). The parties agree that the surety is not required by statute or regulation to exhaust either of these remedies.  (*See* Defs.' Mot. Summ. J. 6.)  The surety may also file a motion to reopen.  8 C.F.R. § 103.5.

"A final determination that a bond has been breached creates a claim in favor of the United States . . . ."  8 C.F.R. § 103.6(e).  If payment is not made within 30 days of demand for

payment, "interest, penalty, and handling charges" accrue from the date of the first demand, and will be payable as damages. . . ."  I-352, General Terms and Conditions.

## II.    JURISDICTION

Before it can consider the parties' arguments about the contested bond breaches, the Court must clarify the basis for its jurisdiction and the applicable standard of review.  As explained above, the Court is currently reviewing Defendants' decision to breach 41 bonds that were identified as part of the ADR Agreement in this case.  The Court agrees with Defendants that it has jurisdiction to consider Plaintiffs' request for a declaratory judgment regarding Defendants' decision to breach these bonds under 28 U.S.C. § 1331 and pursuant to the Administrative Procedures Act, 5 U.S.C. § 704 (APA) ("Agency action made reviewable by statute and final agency action for which there is no adequate remedy in a court are subject to judicial review.").  Section 702 of the APA provides a clear waiver of sovereign immunity.  5 U.S.C. § 702; *see also Stockman v. Federal Election Com'n*, 138 F.3d 144. 151 n.3 (5th Cir. 1998)**.**[6]

The Court also has jurisdiction to consider Defendants' counterclaim under 28 U.S.C. § 1345.  By bringing  this counterclaim, Defendants have waived sovereign immunity as to certain claims by Plaintiffs, *see Frederick v. United States*, 386 F.2d 481, 488 (5th Cir. 1967) (noting that when the sovereign sues, it waives immunity as to certain claims, but not to "claims of a different form or nature than that sought by it as plaintiff"), and Plaintiffs must be allowed to present defenses to the counterclaim.  The Court believes that Defendant's counterclaim confers jurisdiction on the Court to entertain Plaintiffs' argument that certain bonds were settled.  *See*

---

[6] Defendants argue that there are grounds to dismiss Plaintiffs' stand alone claim under the Freedom of Information Act (FOIA).  5 U.S.C. § 552.  Pursuant to the ADR Agreement, the Court will limit its review to the final agency action on the bonds identified as part of the ADR process.  Because Defendants have provided Plaintiff with all requested documents related to these bonds, the FOIA claims with respect to these bonds are moot.  The Court declines, therefore, to reach the question of whether Plaintiffs adequately stated a claim for relief under FOIA in this opinion.

discussion *infra* Part VI(G).  The Court is otherwise convinced, however, that the proper defense to Defendants' claim to enforce the Agency's breach decision is that the Agency's breach decision is unenforceable because it was arbitrary and capricious.  This is precisely the defense that Plaintiffs asserted in their Answer.  (Doc. No. 28.)

## III.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Id.*  Conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Cross motions for summary judgment do not alter the basic Rule 56 standard; instead the Court must determine whether either of the parties deserves judgment.

## IV.    STANDARD AND SCOPE OF REVIEW

The Court will review the disputed bond breach determinations under the arbitrary and capricious standard set forth in Section 706 of the APA.  5 U.S.C. § 706(2)(A).  The Court will limit its review to the administrative record, but finds that Plaintiffs did not waive arguments they did not raise during their administrative appeals.

### A.      Defendants did not stipulate to de novo review.

Plaintiffs maintain that the parties stipulated in the ADR Agreement that the Court would review the contested bond breach determinations de novo.  Plaintiffs point out that, pursuant to the ADR Agreement, Defendants produced to the Court a copy of the full A-file and a joint statement of facts for each purported defense, not just the record before the Agency at the time of the bond breach determination.  Defendants, on the other hand, argue that they did not intend to stipulate to de novo review in the ADR Agreement.  Defendants further contend that any such stipulation would be a nullity because parties may not stipulate to a legal standard.

It is not clear whether an agency can stipulate to de novo review of its own decisions in an APA case.  Defendants are correct that parties generally may not stipulate to the legal effect of admitted facts, *see, e.g.*, *Humble Oil & Refining Co. v. Sun Oil Co.,* 191 F.2d 705, 714 (5th Cir. 1951) (citing *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281 (1917).  Courts have reached different conclusions, however, as to whether an agency may allow a court to review its own action de novo.  *See Asarco, Inc. v. EPA*, 616 F.2d 1153, 1156 (9th Cir. 1980) ("Courts have apparently split over the issue whether an agency can waive the requirement that a district court must not conduct a de novo review of agency adjudicatory action." (comparing *Cooperative Services, Inc. v. HUD*, 562 F.2d 1292, 1295 (D.C. Cir. 1977) with *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228 (8th Cir. 1975)).

Even if an agency could stipulate to a less deferential standard of review, however, it is not clear that Defendants intended to do so in this case.  The ADR Agreement does not explicitly

state that the parties stipulated to de novo review.  Defendants did agree to provide full copies of the A-files related to each of the 50 breach determinations to the Court, and those files admittedly contain information that was not part of the administrative record.[7]  Defendants maintained at a hearing on the pending motions that they agreed to do so at Plaintiffs' insistence and in the hopes of resolving Plaintiffs' claims through the ADR process, not because they thought that the Court could properly consider the records when reviewing any contested bond breaches.  Furthermore, when the parties provided the Joint Appendix to the Court, they specifically reserved the right to object to the relevance or admissibility of any of the documents. Finally, Plaintiffs themselves acknowledge that it is sometimes possible for a Court to review documents outside of the administrative record even under arbitrary and capricious review. Thus, the fact that parties submitted documents outside of the record to the Court does not compel the conclusion that Defendants agreed to de novo review of the bond breach determinations.

Transcripts of hearings leading up to the ADR Agreement do not provide further clarity. Defendants initially told the Court that they had proposed the ADR framework to "save both the plaintiff and the government enormous amounts of time and money" and to avoid "full blown discovery" in 1400 separate cases.   (Sept. 6, 2005 Tr. at 22).  Defendants also explained:

> We have offered in our ADR proposal to give them a copy of the record of proceedings, which is the full copy of the record that was before the Administrative Appeals Office when they considered the bond breached determinations on appeal, as well as any additional information that may not have been a part of the record of proceedings that . . . would be available under a FOIA request had one been presented.  But to do so not on 1400 bonds at once, which would be extremely unmanageable for the government, but to do so on a more discrete basis [inaudible] and some subset of the 1400 bonds that we can separate by issue to review and to try and reach resolution on to the extent we can ourselves and to the extent we cannot with the Court's assistance.

---

[7] Plaintiffs have also produced documents that were not part of the administrative record.

(*Id.* at 29-30.)  Defendant also stated that most "if not all" of the information "that relates to whether or not the breach was proper . . . are all a part of the record of proceedings."  (*Id.* at 34.) After the ADR Agreement was signed, Defendants (through different counsel) repeatedly emphasized that the Court would be reviewing only the administrative record when deciding the bonds that the parties could not agree on under the ADR framework.  (Tr. Mar. 9, 2006 at 14 ("[The administrative record is] the basis for the administrative action.  That's what the Court would be reviewing.").)  Plaintiffs disagreed with Defendants' assessment at times, (*see, e.g.*, Tr., May 1, 2006, at 16 ("I thought we had an admission from the government that wasn't all that was before the court from the past.")), but have not pointed the Court to any specific admission from Defendants in the transcripts.

The Court recognized at the hearing on the pending motions that it thought the purpose of the ADR Agreement was to give a full ventilation to all issues and all relevant documents. However, based on the record before it, the Court cannot find that Defendant clearly agreed to allow de novo review of the bond breach determinations.[8]

### B.      De novo review is not warranted due to inadequate factfinding procedures.

Plaintiffs maintain that the Court should consider the bond breach determinations *de novo* because Defendants' fact-finding procedures were inadequate.  In *Citizens to Protect Overton Park, Inc. v. Volpe*, the Supreme Court held that de novo review "is authorized when the action is adjudicatory in nature and the agency factfinding procedures are inadequate."  401 U.S. 402, 415 (1971); *see also Camp v. Pitts*, 411 U.S. 138, 141-42 (1973) (noting that "de novo review is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative

---

[8] This does not mean that the ADR process was, as Plaintiffs insist, an enormous waste of time and resources.  At least some bonds were resolved through the process, and Plaintiffs finally were allowed to see the documentation that they claim they were entitled to receive pursuant to their Freedom of Information Act requests.

actions."). After *Overton Park*, "*de novo* review of agency adjudications has virtually ceased to

exist. In its stead, the arbitrary and capricious' standard of review of 5 U.S.C. § 706(2)(A) is now

applied to review of agency determinations in the adjudicatory setting." *Sierra Club v. Peterson*,

185 F.3d 349, 368 n.29 (5th Cir. 1999). De novo review is only available "in special

circumstances where [an] agency does not possess adequate factfinding procedure, not just that it

failed to employ adequate procedures." 33 CHARLES ALAN WRIGHT AND CHARLES H. KOCH, JR.,

FEDERAL PRACTICE AND PROCEDURE § 8332. Furthermore, "[w]here a court finds that the

agency factfinding is inadequate but that the agency has the procedural authority to correct the

inadequacy then the court's proper function is to return the matter to the agency with instructions

as to how to correct the inadequacy." *Id.* § 8372.

The Fifth Circuit has applied de novo review in at least one case based on inadequate

factfinding procedures. *See Porter v. Califano*, 592 F.2d 770, 782 (5th Cir. 1979) ("[W]e find

the process inadequate in the instant case because the biased or otherwise inadequate initial fact-

finding process was not cured by a subsequent impartial and full review in the agency."). In

*Porter*, two officials accused of corruption were themselves involved in the fact-finding process.

592 F.2d at 782 ("The chief inadequacy in the agency fact-finding procedures used in this case

was the pervasive role played by . . . the officials Porter explicitly accused of corruption."). In

addition, the investigation surrounding Porter's appeal "did not entail an adequate inquiry into

the central issues in the case," and "to the extent questions about these matters were asked, they

were asked, without benefit of cross-examination, only of persons accused of wrong-doing by

Porter." *Id.* In addition, Porter was "denied an opportunity to confront her accusers even in the

most rudimentary sense." *Id.*

Plaintiffs argue that DHS' factfinding procedures are similarly inadequate. Plaintiffs

claim that DHS wrongfully withheld relevant documents that Plaintiffs sought through FOIA,

thus depriving Plaintiffs of any meaningful opportunity to submit comments, provide information to the record, or present oral argument.  Plaintiffs also note that Defendants have conceded that they wrongly declared nine of the 50 bonds breached, and argue that this provides further evidence of the agency's inadequate procedures.  Defendants counter that no relevant documents were actually omitted from the agency's proceedings and convincingly argue that Plaintiffs could have obtained much of the evidence they needed from sources other than FOIA.  Plaintiffs were not restricted from providing this evidence to the agency on appeal.  *See Conax Florida Corp. v. United States*, 824 F.2d 1124, 1129 (D.C. Cir. 1987) (refusing to apply de novo review "because the fact finding procedures employed by the agency were by no means inadequate. Indeed, there were absolutely no restrictions on the amount or type of evidence that Conax was permitted to submit to the contracting officer.").  Defendants' alleged failure to comply with FOIA is troublesome, and the cancellation or rescission of several bond breach determinations raises some concerns about the agency's current bond breach determination process.  The facts of the case at hand are not nearly as exceptional as those present in *Porter*, however.  At best, Plaintiffs have shown that the Agency failed to employ adequate procedures, not that the Agency does not possess such procedures.  The Court will not, therefore, take the extraordinary step of applying de novo review.

**C.    The Court will apply arbitrary and capricious review and will generally limit review to the administrative record.**

The Court will apply arbitrary and capricious review to the agency's bond breach determinations.  5 U.S.C. § 706(2)(A) (a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.")  "Although *Overton Park* truncated the use of *de novo* review, it vastly expanded the range of arbitrary and capricious review under § 706(2)(A)." *Sierra Club v. Peterson*, 185 F.3d 349, 368 (5th Cir. 1999)**.**  "[W]hile the arbitrary and capricious standard of

review is highly deferential, it is by no means a rubber stamp." *Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*, 374 F.3d 362, 366 (5th Cir. 2004). Agency action is entitled to a presumption of regularity, but "that presumption is not to shield [its] action from a thorough, probing, in-depth review." *Overton Park*, 401 U.S. at 402. The Supreme Court further explained in *Overton Park*:

> [T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

401 U.S. at 416. The Court must therefore uphold the agency's decision if it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its actions including a 'rational connection between the facts found and the choice made'" *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The Court should not, however, "weigh the evidence in the record pro and con." *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994).

Arbitrary and capricious review is usually limited to review of the record that was before the agency at the time its decision was made. *See Overton Park*, 401 U.S. at 420; *Camp*, 411 U.S. at 142 ("The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *State of La., ex rel. Guste v. Verity*, 853 F.2d 322, 327 n. 8 (5th Cir. 1988) ("Nor are the courts permitted to consider evidence outside the administrative record. . . . Agency action is to be upheld, if at all, on the basis of the record before the agency at the time it made its decision"). Under certain circumstances, however, a court may look to evidence outside of that record when applying arbitrary and capricious review. *See, e.g.*, *Overton Park*, 401 U.S. at 420 ("[S]ince the bare

record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard"); *Citizen Advocates For Responsible Expansion, Inc. (I-Care) v. Dole*, 770 F.2d 423, 438 n. 18 (5th Cir. 1985) (allowing supplementation of an inadequate administrative record because, *inter alia*, "a plaintiff who demonstrates that the agency developed an inadequate record should be afforded an opportunity, in essence, to develop that record ."); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (allowing parties to supplement the administrative record when an agency failed to comply with its own procedural requirements, raising "serious questions as to whether the adjudicative officials at any given point considered all relevant factors in reaching their determinations," and failed to gather the underlying facts in a coherent record); *see also Ware v. U.S. Federal Highway Admin.*, No. Civ.A. H-04-2295, 2006 WL 696551, at *4 (S.D. Tex. Mar. 15, 2006) ("A narrow exception permits a court to examine evidence beyond the administrative record if that evidence: . . . (2) shows an agency failed to consider relevant evidence; or (3) shows an agency, in bad faith, failed to include information it considered in the record.").

Although Plaintiffs have raised legitimate concerns about some of DHS' practices, this is not a case involving an entirely absent record or a record that is so incomplete that it is not susceptible to judicial review. The Court will generally limit its review to the administrative record. If, in the case of any particular bond breach determination, the Court finds that the agency developed an inadequate record or that there are serious questions as to whether the agency considered all relevant factors in reaching their determinations, the Court will remand those bond breach determinations to the Agency for further review.

      **D.**      **Plaintiffs have not waived defenses not raised on appeal, but Plaintiffs have waived defenses not raised on reconsideration.**

Defendants argue that the Court should not consider any defenses that Plaintiffs did not raise before the agency on appeal.[9]  Issue exhaustion may be required either "where parties are expected to develop the issues in an adversarial administrative proceeding" or where an agency's regulations "require issue exhaustion in administrative appeals."  *Sims v. Apfel*, 530 U.S. 103, 108, 110 (2000).

The bond breach appeal process does not appear to be the kind of adversarial proceeding contemplated in *Sims*.  It is not a formal adjudication between two parties.  In fact, though the proceedings are far from identical, there are some similarities between the bond breach appeals process and the Social Security appeals process.  As the Fifth Circuit recognized in *Delta Foundation, Inc. v. United States*, in the Social Security context, no representative for the Agency goes before the ALJ to oppose the claim, parties are "permitted, but are not required, to file briefs with the Appeals Council," and the Appeals Council may review material evidence outside the record promulgated by the parties.  303 F.3d 551, 560-61 (5th Cir. 2002) (discussing *Sims*, 530 U.S. at 111-12).[10]  In the bond breach context, the Agency itself compiles a record consisting of certain documents,  (*see* Adjudicator's Field Manual, §10.8(a)(3), Gov. Appx. 058), counsel for USCIS is not required to prepare a brief, (*id*. §10.8(a)(1), Gov. Appx. 057), and the appellant is permitted, but not required, to file a brief of his own, 8 C.F.R. § 103.3(a)(2)(vi).  This record confirms that Agency sometimes reviews evidence not provided by the parties and

---

[9] Defendants concede that Plaintiffs were not required to exhaust administrative remedies and thus do not argue that Plaintiffs waived any defenses when they failed to appeal a bond breach determination.

[10] In *Delta*, the Fifth Circuit held that issue exhaustion was required in Department of Health and Human Services proceedings because those proceedings were sufficiently adversarial.  303 F.3d at 561-62.  The proceedings at issue in *Delta* involves opposing parties, each of which "participates in developing an appeal file for the DAB to review, including written arguments supportive of the party's claims." *Id.*  "[T]he parties appear before the DAB as adversaries, charged with presenting their arguments and supporting witnesses and effectively discrediting opposing parties through cross-examination." *Id.*  The bond breach appeals process is clearly distinguishable from this type of adversarial proceeding.  Defendant's reliance on *Trident Seafoods, Inc. v. N.L.R.B.*, 101 F.3d 111 (D.C. Cir. 1996), a case addressing issue exhaustion in the context of a formal adjudication and *Bolack Minerals Co. v. Norton*, 370 F. Supp. 2d 161, 170 (D.D.C. 2005), a case involving far more adversarial proceedings, is likewise misplaced.

has sustained appeals based on grounds not set forth by the parties in the notice of appeal. (*See* Jt. Appx. 2626-2628.)   Thus, the Court does not believe that the bond breach appeal process is the kind of adversarial process that provides strong reasons for a court to require issue exhaustion. *See Sims*, 530 U.S. at 109 ("Where the parties are expected to develop the issues in an adversarial administrative proceeding . . . the rationale for requiring issue exhaustion is at its greatest.  Where, by contrast, an administrative proceeding is not adversarial, . . . the reasons for a court to require issue exhaustion are much weaker.").

Issue exhaustion may also be required by regulation.  In *Sims*, the Court noted that issue exhaustion was required by a regulation that obliged a party to "lis[t] the specific issues to be considered on appeal." 530 U.S. at 108 (citing 20 CFR § 802.211(a) (1999)).  By contrast, the regulation governing bond appeals simply states that an appeal may be summarily dismissed if the party states *no* reason for the appeal.  8 C.F.R. §103.3(a)(1)(v).  ("An officer . . . shall summarily dismiss any appeal when the party concerned fails to identify specifically *any* erroneous conclusion of law or statement of fact for the appeal." (emphasis added)).  The regulations governing motions to reopen and motions to reconsider are more specific, however. *See* 8 C.F.R. § 103.5 (a)(2) ("A motion to reopen must state the new facts to be provided in the reopened proceeding and be supported by affidavits or other documentary evidence."); 8 C.F.R. § 103.5(a)(3) ("A motion to reconsider must state the reasons for reconsideration and be supported by any pertinent precedent decisions to establish that the decision was based on an incorrect application of law or Service policy.").

To the extent that Plaintiffs are appealing the Agency's decision on a Motion for Reconsideration or a Motion to Reopen, issue exhaustion does appear to be required by regulation.  However, it may have been futile for Plaintiffs to raise many of the defenses asserted in this lawsuit.  *See McCarthy v. Madigan*, 503 U.S. 140, 147 (1992); *Hormel v. Helvering*, 312

U.S. 552, 557 (1941).  The Court will address the futility question on a case by case basis, *infra*.

Issue exhaustion does not appear to be required by regulation on appeal, however.  The Court is

not required defer to the Agency's interpretation of 8 C.F.R. §103.3(a)(1)(v), which appears to

be set forth for the first time in this litigation, because it appears to be "plainly erroneous or

inconsistent with the regulation."  *Belt v. EmCare, Inc.*, 444 F.3d 403, 417 (5th Cir. 2006) (citing

*Auer v. Robbins*, 519 U.S. 452, 461 (1997)).  The Court therefore concludes that the regulations

governing motions to reopen or reconsider do mandate issue exhaustion, but the regulations

governing appeals do not mandate issue exhaustion.  To the extent that exhaustion was required

on a motion to reopen or reconsider, the Court will determine on a defense by defense basis

whether it would have been futile for Plaintiffs to raise such an argument.

## V.        AMWEST SETTLEMENTS AND AMWEST MEMORANDUM

Before the Court can examine the merits of each purported defense, it must first consider

the relevance of a 1995 and 1997 Settlement Agreement in the case *Amwest Surety Insurance*

*Co., et al. v. Reno, et al.*, C.D. Cal., No. 93-3256 JSL(SHx) and an agency memorandum

explaining the application of the settlement provisions to other sureties.

On June 22, 1995, INS entered into a Settlement Agreement with Amwest Surety

Insurance Company, Far West Surety Insurance Company, and Gonzales and Gonzales Bonds

and Insurance Agency (Amwest I Settlement).  (Jt. Appx. 672.)  In the underlying lawsuit,

*Amwest Surety Insurance Co., et al. v. Reno, et al.*, No. 93-3256 JSL(SHx) (C.D. Cal.), Plaintiffs

sought a declaration that INS's "interpretation of its Bond Contract (Form I-352) was contrary to

case law, statute, and INS policy."  (Jt. Appx. 673.)  While continuing to deny those claims, the

Agency agreed in the settlement agreement to distribute several policy statements "to all regional

and district offices . . . with instructions that the policies stated shall be implemented

immediately.'"  (Jt. Appx. 674-75 para. 2.)  Although the nine policy statements attached to the

settlement appear to generally clarify the agency's position on certain statutory and regulatory provisions and agency policies governing immigration bonds, the agreement, by its terms, only applied to the actual parties to the settlement. (Jt. Appx. 675 ("The attached policy statements are binding on the parties in their contractual relationship formed through the execution of any immigration bond contract . . . .").)  The Agency also agreed to certain practices and policies in the text of the Settlement Agreement itself.[11]

On September 10, 1997, the parties to the Amwest I Settlement entered into a second settlement agreement (Amwest II Settlement).  (Gov. Appx. 65.)  In the Amwest II Settlement, the Government agreed "to immediately send" an "INS Field Memorandum . . . in a format substantially similar . . . to the document attached hereto as Exhibit 'A' to all District Directors and District Deportation Directors throughout the United States and to the AAU."  (Gov. Appx. 66.)  The attached draft Field Memorandum provided guidance regarding the implementation of the Amwest I Settlement policy statements and clarified:  "As a matter of policy and fairness . . . INS has decided to apply [the Amwest I Settlement] terms to such contracts with all other companies who underwrite immigration bonds."[12]  (Gov. Appx. 70-82.)  The Government also agreed to train  deportation officers on the policies in the field memo by January 31, 1998.  (Gov. Appx. 66.)

At some point thereafter, a substantially similar draft memorandum ("Amwest Memorandum") was authored by the Agency.[13]  (Jt. Appx. 657.)   Most of the text of the

---

[11] For example, the Agency agreed: 1) "that if INS intends to notify the alien of the date and time of deportation, such notice will not be mailed to the alien before, and not less than 3 days after, the demand to produce the alien is mailed to the bond obligor;" 2) "to send the surety a copy of any new or amended Order to Show Cause;" 3) to a "new policy providing for the mitigation of the liquidated damages due on a breached bond;" and 4) "that no form I-323 . . . shall be sent to the obligor more than 180 days following the date of the breach."  (Jt. Appx. 675-78.)

[12] The names David Martin, General Counsel, and Mark K. Reed, Acting Executive Associate Commissioner of Field Operations appear at the bottom of the Field Memorandum.

[13] In response to questions from the Court regarding the Amwest Memorandum, Defendants note only that the undated memorandum was prepared "sometime after March 1996."  The Amwest II Settlement was signed in 1997. The Amwest Memorandum includes the name of Paul W. Virtue, General Counsel for INS.  According to a publicly

Amwest Memorandum is identical to that of the Field Memorandum attached as Exhibit A the

Amwest II Settlement.[14]   (Jt. Appx. 657-671.)   The Memorandum includes a line stating that it is

"from" Paul W. Virtue, General Counsel, and Michael A. Pearson, Executive Associate

Commissioner of Field Operations.[15]   (*Id.*)   The copy before the Court retains the word "draft"

on the top of the first page.   Like the Field Memorandum, the Amwest Memorandum—addressed

to "All Regional Directors, All District Directors, Administrative Appeals Offices," and others—

states an intention to "provide comprehensive guidance for the implementation" of the Amwest I

Settlement.   The Amwest Memorandum explains that the guidance contained therein is to replace

that provided in a November 14, 1995 Office of Programs memorandum entitled *Instructions re:*

*new bond policies and procedures* and March 1996 training materials entitled *New Bond Policies*

*and Procedures*.   (Jt. Appx. 658.)

Like the Field Memorandum, the Amwest Memorandum explains that in the Amwest I

Settlement, the Agency had "agreed to implement specified modifications to its immigration

bond program" and again states: "By its terms the Settlement Agreement applies only to

immigration bonds underwritten by Amwest and Far West. . . .   As a matter of policy and

fairness, however, INS has decided to apply its terms to such contracts with all other companies

who underwrite immigration bonds."   (Jt. Appx. 658.)   The Memorandum further notes:

> [A]rguably, an INS failure to comply with any provision in [the policy statements
> attached to the Amwest I  Settlement] would provide the obligor with a defense
> against an INS attempt to enforce a breach.   No court has ruled on this issue, and
> INS has not conceded the point, but all offices should attempt to minimize the
> instances in which it might arise.

---

available INS publication, Mr. Virtue did not become General Counsel of INS until 1998. *See People on the Move: Virtue Leaves INS for Private Law Firm in Washington, D.C.*, Communiqué, Vol. 22, No. 6 (June 1999) ("[Virtue] was named INS general counsel in 1998.").  Thus, it seems more likely that the Amwest Memorandum was prepared after, not prior to, the Amwest II Settlement.

[14] One example of a difference is that the Amwest Memorandum contains discussions of the Illegal Immigration Reform and Immigrant Responsibility Act that were not included in the Draft Memorandum attached to the Amwest II Settlement.

[15] The Government emphasizes that the memorandum is unsigned.  There is no blank line for a signature on the document, however, and it is unclear whether such a memorandum was required to be signed.

(Jt. Appx. 658.)  The Memorandum goes on to discuss in great detail the provisions of the settlement and attached policy statements.

There is great dispute over what became of the Amwest Memorandum.  This case appears to be unique in that the Agency maintains that it never actually adopted the policies or interpretations in the Amwest Memorandum in the first place, not just that it should not be bound by those policies or interpretations.[16]  According to DHS, the Amwest Memorandum was never "officially circulated within DHS or its field offices," but "various versions" of the memorandum "inappropriately found their way to some field offices." [17]  (Wells Declaration, Gov.  Appx at 185.)  In briefing and oral argument before the Court, Defendants have repeatedly insisted that the Amwest Memorandum was "never implemented as the formal policy of DHS," (Defs.' Mot. Summ. J. 31, n 19), that the document did not "purport[] to represent the 'official' position of DHS on any matters contained therein," (Defs.' Resp. to Pls.' Mot. Summ. J. 6), and that "it's not on this record that there are any DHS employees who actually believed Amwest was generally enforceable as policy," (Tr. Oct. 4, 2007).  After this lawsuit was filed, DHS circulated another memorandum ("Cerda Memorandum") to Field Office Directors regarding the Amwest Settlements.  The Cerda Memorandum recognizes that "[s]ince 1995, there has been some uncertainty among Field Offices concerning what authorities should guide a determination to issue a Declaration of Breach on an immigration delivery bond."  (*Id*.)  The Cerda Memorandum also states that as of March 11, 2005, field offices are not to refer to the Amwest Settlements or any version of the Amwest Memorandum when making bond breach determinations unless the bond was posted by a party to the Amwest Settlements.  (Gov. Appx. 186-88.)

---

[16] Nor is the Court aware of any other case in which an Agency allegedly committed to generally applicable policy statements and interpretations as part of a settlement agreement.

[17] The Agency does not specifically state whether any other memorandum that would have fulfilled the Agency's obligations in the Amwest II Settlement was ever sent or whether the Agency ever fulfilled its Amwest II Settlement commitment to train deportation officers on any of the policies set forth in the Field Memorandum.

Plaintiffs claim that the Amwest Memorandum was "widely circulated in the bond industry."  (Mendoza Aff. ¶ 5.)  Plaintiffs have not clarified *who* circulated the memo, and Defendants claim that it was circulated by members of the bond industry itself.  Plaintiffs do not argue that the Agency consistently applied the policies set forth in the Amwest I Settlement or Amwest Memorandum, and instead complain that the Agency has regularly failed to do so. Plaintiffs do, however, provide evidence indicating that at least some DHS employees, including, but not limited to Field Office personnel, acted on the belief that the provisions of the Amwest Settlement had been extended to all sureties and/or that some parts of the Amwest Settlement were enforceable as policy.  The Court will briefly summarize that evidence.

First, the Agency recognized that the "requirements" of the Amwest Settlement were extended to all sureties in at least two other settlement agreements.[18]  (See *INS v. Allegheny Casualty Company* Settlement Agreement, Nov. 3, 1998, Pls.'s Resp. to Defs.' Mot. Summ. J., Ex. B. ("The Parties determined that a significant number of these breaches arguably contained evidence of actions that were not in accord with the requirements of a June 1995 Settlement in the case of AMWEST v. Reno, No 93-2356 (JSL)(SHx) (C.D.Ca.), which INS subsequently extended to all sureties for immigration bonds."); *INS v. Nobel Insurance Company* Settlement Agreement, Aug. 17, 1999, Pls.'s Resp. to Defs.' Mot. Summ. J., Ex. C. (same)).  In the *Nobel* settlement, the Agency went on to say, however, that "INS does not agree, however, that these actions necessarily require cancellation of a breach." (Pls.'s Resp. to Defs.' Mot. Summ J., Ex. C.)

---

[18] Both settlements are signed by the Associate General Counsel for INS.

Secondly, when responding to Plaintiffs' FOIA requests, the agency has on some occasions stated that the request "will be processed pursuant to the settlement in *Amwest v. Reno* … rather than the Freedom of Information Act."[19]  (*See, e.g.*, Pls.' Mot. Partial Summ. J. Ex. C.)

Third, the Administrative Appeals Office has frequently cited one provision of the Settlement Agreement.  *See, e.g.  In re Obligor*, 2005 WL 2271462 (INS May 3, 2005) ("The present record contains evidence that a properly completed questionnaire . . . was forwarded to the obligor . . . pursuant to the Amwest/Reno  Settlement Agreement."); *see also* Jt. Appx. 0355; Jt. Appx. 0580; Jt. Appx. 0609.[20]  The Administrative Appeals Office is not, of course, a Field Office that may have "inappropriately" received a copy of the Amwest Memorandum.

Fourth, the I-352 Bond Contract itself seems to recognize that the Agency considered itself bound to take certain actions pursuant to the Amwest Settlement.  I-352, General Terms and Conditions ("Paragraph seven of the settlement in AMWEST SURETY v. RENO . . . requires that INS send a copy of any new or amended Notice to Appear or amended order to Show Cause to the obligor.").  Interestingly, most of the provisions set forth in the *text* of the Amwest I Settlement also appear to be reflected in the language of the current I-352 Bond Contract, even though these provisions do not reference the settlement explicitly.  For example, the I-352 includes:  a provision that INS not mail notice of a demand for deportation until three days after the demand is sent to the obligor; the relevant provisions set forth in the Amwest I

---

[19] In the Amwest I Settlement, the Agency agreed to "seek the addition of a new 'routine use' to the appropriate Privacy Act 'system of records' that will permit the disclosure of any information which would reasonably aid in locating  an individual, to any obligor which posted an immigration bond for that individual while he or she was in deportation or exclusion proceedings." (Jt. Appx. 675.)  The draft Field Memorandum and Amwest Memorandum explained that the Agency had sought such an amendment and had added such a routine use, noting that "[t]his routine use also applies to INS's processing of Freedom of Information Act (FOIA) requests from obligors for records concerning aliens for whom they have posted a bond.  When an obligor identifies itself as such, and attaches a copy of its bond contract to its request, the office processing that request should not withhold any records under either of the FOIA personal privacy exemptions . . . except for highly personal ones . . . which have no reasonable connection to the bond." (Gov. Appx. 79; Jt. Appx. 668.)

[20] Defendants argument that this case might have involved one of the actual parties to the Amwest Settlement is entirely unpersuasive given that the AAO has made the exact same statement in several decisions of appeals filed by Plaintiffs.

Settlement regarding mitigation; and a statement that a breach will be stale and unenforceable if a I-323 notice of breach is sent to the obligor more than 180 days following the date of breach. (*Compare* I-352 Bond Contract *with* Amwest I Settlement, Jt. Appx. 675-78.)

Finally, in a notice of proposed rulemaking published in the Federal Register, the Agency stated on May 9, 2002 that "While the [Amwest I] settlement agreement applied only to bonds underwritten by the plaintiffs, the Service as a matter of policy and fairness decided to apply the terms of the settlement agreement to all other companies underwriting immigration bonds." Requiring Aliens Removed from the United States to Surrender to the Immigration and Naturalization Service for Removal, 67 Fed. Reg. 31157, 31160 (May 9, 2002); *see also* 44 U.S.C. § 1507.  The Agency went on to state in the Notice that it had considered the effects of that policy with respect to the proposed rule and had determined that it "should be modified for all bonds posted after the effective date of this rule." *Id.*

Plaintiffs have provided some evidence that the Agency did, in fact, have a policy of extending provisions of the Amwest I Settlement to other sureties.  Based on the evidence in the summary judgment record, however, the Court cannot conclude that the Agency actually adopted the specific draft Amwest Memorandum included in the summary judgment record as a general agency policy or interpretation.  Plaintiffs have not provided evidence that directly contradicts the Agency's sworn statement that this exact document was never formally circulated to Field Offices or the implication that the Agency never intended the document to be distributed.  As such, the Court cannot conclude that this draft, undated memorandum constituted an agency statement of policy or interpretive rule.  *See also Wilderness Society v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) (noting that the APA requires general statements of policy to be published).

Even if the Agency in some other manner adopted an informal policy to apply the provisions of the Amwest Settlement to all sureties,[21] the Bond Contract itself specifically states that "[t]he express language of the bond contract shall take precedence over any inconsistent policies or statements."  I-352, General Terms and Conditions.  As explained below, the Court finds that the language of the Bond Contract does address many of Plaintiffs' alleged defenses and concludes that it need not look to any other Agency policy or statement with regard to these provisions.

In the case of two defenses, however—Alien Granted Voluntary Departure and Failure to Provide a Questionnaire—the Bond Contract is silent.[22]  As to these defenses, the Court will consider whether a prior Agency policy or interpretation existed and, if so, whether the Agency was entitled to reverse that prior policy.  The Court will engage in that analysis in its discussion of these two defenses, *infra*.

## VI.    DEFENSES AVAILABLE TO SURETIES

The heart of the dispute before the Court revolves around Defendants' unwillingness to acknowledge certain defenses that Plaintiffs claim should either cancel a bond or excuse a bond breach.  The Court will examine the parties' arguments about each purported defense.

---

[21] For example, the Amwest Memorandum itself states that it replaces the guidance set forth in a 1995 and 1996 memorandum.  If it is true, as the Agency alleges, that the Amwest Memorandum was never signed or fully circulated, it seems that the guidance set forth in the previous memoranda may have remained in force.  Unfortunately, the text of those documents are not before the Court and neither party has discussed them.  Furthermore, in doing secondary source research on the parties' arguments, the Court has become aware of the possible existence of at least two other agency memoranda regarding the Amwest Settlement.  For example, one author has noted that "INS's failure to attach a questionnaire results in rescission of any breach declared based on the surety's failure to comply with an INS notice demanding the surrender of an alien for deportation," citing, *inter alia*, an "INS memorandum re: 'Continuing Failures to Comply with Amwest Settlement,' dated May 14, 1999."  Steven H. Rittmaster, *Immigrant Bonds*, *in* THE LAW OF MISCELLANEOUS AND COMMERCIAL SURETY BONDS 203, 211 n. 58 (Todd C. Kazlow & Bruce C. King, eds., 2001).  The same article goes on to discuss other aspects of the questionnaire requirement, citing "INS memorandum re 'Compliance with Amwest Settlement,' June 4, 1999."  It is unclear from the context of the article whether these memoranda address the application of the Amwest Settlement to all sureties or only to the parties to the settlement, and, again, the text of these memoranda are not before the Court.

[22] The Bond Contract is also silent as to the "Untimely Removal" Defense.  Plaintiffs do not rely, however, on the Amwest Memorandum or Settlement Agreement in their arguments regarding this defense.

### A.    Defense No. 1: No Notice

#### 1.    I-340 No Notice Defense

The General Terms and Conditions of the I-352 Bond Contract state that "INS shall notify the obligor of a demand to produce the alien, the breach or cancellation of a bond, and any demand for payment of a bond."  (I-352.)  INS provides notice of a demand to produce the alien by sending an I-340 "Notice to Deliver Alien" form setting forth the time, date, and place to deliver the alien.  The relevant regulations do not explicitly mention the Bond Contract provisions requiring notice of a demand to produce the alien, stating only that "A bond is breached when there has been a substantial violation of the stipulated conditions."  *See* 8 C.F.R. 103.6(e).  Surely, however, the Agency may not ignore the relevant provisions of the Bond Contract when determining whether a bond has been breached.  The Bond Contract clearly states that "[a] delivery bond is breached when in response to a timely demand, the obligor either [sic] fails to produce the alien at the location specified in that demand."  I-352, General Terms and Conditions.  The I-352 reiterates in section G(1) that the bond becomes due and payable "if the obligor fails to surrender the alien in response to a timely demand while the bond remains in effect."  (*Id.*)  The I-352 form also allows both the obligor and agent or co-obligor to provide an address and includes and to check one of the following boxes:  "Address to use for notice purposes:  [ ] Obligor  [ ] Agent  [ ] Both."

The express language of the Bond Contract makes clear that a bond is breached only if Defendants make a timely demand to produce the alien.  A timely demand to produce the alien is, therefore, a condition precedent to Plaintiffs' performance.  Defendants argue that they can fulfill this requirement by sending notice to the obligor alone, even if the agent (in this case, AAA) provides an address and checks the box indicating that the address for both the obligor and the agent are to be used for notice purposes.

The I-352 is a contract, and the instructions on the form have been "incorporated into the section of the regulations requiring its submission."[23]  8 C.F.R. § 103.2(a); 8 C.FR. § 299.1; *see also* I-352, General Terms and Conditions ("Federal law shall apply to the interpretation of the contract, and its terms shall be strictly construed.").  The Court interprets contracts to give effective meaning to all terms, and assumes that no part of the agreement is superfluous.  *See Medlin Const. Group, Ltd. v. Harvey*, 449 F.3d 1195, 1200 (Fed. Cir. 2006) ("The general rules of contract interpretation apply to contracts to which the government is a party. A reasonable interpretation must 'assure that no contract provision is made inconsistent, superfluous, or redundant.'" (internal citations omitted)); REST. (SECOND) OF CONTRACTS § 203(a), cmt. (b).  Furthermore, "in choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds."  REST. (SECOND) OF CONTRACTS § 206; *see also Grumman Data Systems Corp. v. Widnall*, 15 F.3d 1044, 1048 n. 4 (Fed. Cir. 1994) (noting that the doctrine of contra proferentum "has been repeatedly applied in the field of government contracts.").

The terms of the I-352 Bond Contract are somewhat contradictory. Although the Terms and Conditions state that INS must send notice of a breach to "the obligor," the form also includes a box that, if checked, directs the agency to use the address of both the obligor and the agent "for notice purposes."  If the court were to read the contract, drafted by the agency, to

---

[23] The Board of Immigration Appeals itself has explained that delivery bonds "create a contract between the Service, the bonding agent and attorney-in-fact, and the surety company." *Matter of Allied Fidelity Insurance Company*, 19 I. & N. Dec. 124, 125 (BIA 1984).  Defendants have not specifically argued in extensive briefing or at oral argument that its interpretation of the terms of the actual I-352 Bond Contract form is entitled to deference.  At least one Circuit has found that no such deference is owed to an Agency's interpretation of a contract.  *See Meadow Green-Wildcat Corp. v. Hathaway*, 936 F.2d 601, 604-05 (1st Cir. 1991) (finding that "neither the language nor the reasoning" of Supreme Court cases discussing deference to agency interpretations of statutes or of its own regulations "suggests they require similar deference to the agency's interpretation of a contract that it makes with an outside party.").

require notice only to the obligor, it would render the "address to be used for notice purposes" language entirely superfluous.[24]

Based on general principles of contract interpretation, the Court finds that the Bond Contract requires the Agency to provide notice of a demand for delivery to both the obligor and the agent if an address is provided for both on the bond form and if the I-352 form indicates that both addresses should be used for notice purposes by a checked box.[25] Notice of a demand to deliver the alien is a condition precedent to performance, and proper notice, as defined by the terms of the Bond Contract, entails sending the I-340 notice to both addresses.

Defendants seem to argue that even where notice is a condition precedent to performance, Plaintiffs may not claim lack of notice as a defense unless they show prejudice or damage. The cases cited by defendant do not involve contracts with notice as a condition precedent, however. *See, e.g., Conesco Industries, Ltd. v. Conforti and Eisele, Inc., D.C.*, 627 F.2d 312, 317, n. 6 (D.C. Cir. 1980) (noting, however, that a "surety should not be able to use the failure to give notice as a defense against recovery under the bond when it has shown no prejudice or damage suffered as a result of the failure to give 'adequate' notice," but recognizing that this is the "minority stance"); *New Amsterdam Cas. Co. v. United States Shipping Board Emergency Fleet Corp.*, 16 F.2d 847, 851-52 (4th Cir. 1927) (recognizing notice was not "among the conditions of the bond" and stating "even where there is a requirement of notice, if this requirement is not made a condition of the bond, the surety company cannot complain of the failure to give notice where no damage had resulted therefrom."). At best, the law in this area appears unsettled. *See* 23 WILLISTON ON CONTRACTS § 61:39 (4th ed. 2007) ("Notice may be

---

[24]Contrary to Defendant's contention, the fact that the obligor and co-obligor are jointly and severally liable for the bond obligations provides even more reason to believe that the co-obligor is entitled to notice.

[25] The agency's current interpretation of the requirements of the bond contract does not directly contradict this interpretation. The 2005 Cerda Memorandum states that a declaration of breach will not be issued when the demand for delivery is not mailed "to the address(es) of the surety and/or its agent (if any) specified on the bond, Form I-352." (Cerda Memorandum 2 (emphasis in original).)

made an express condition of the surety's contract.  If so, the condition must, on principle, be fulfilled. The contracts of compensated sureties frequently contain such a condition, but some courts are reluctant to give the condition its ordinary meaning, and hold that the surety is discharged only to the extent of the loss suffered."); *Southern Sur. Co. v. MacMillan Co*., 58 F.2d 541 (10th Cir. 1932) (noting a "sharp divergence in the authorities as to the effect of failure to give notice of the default of a principal" but following the law of the Eighth Circuit and holding "that if the parties have made the giving of notice a condition upon the obligation of the surety company, failure to give such notice relieves the surety company of liability" (citing *Nat'l Sur. Co. v. Long*, 125 F. 887 (8th Cir. 1903)); *see also Nat'l City Bank v. Nat'l Sec. Co.* 58 F.2d 7, 8 (6th Cir. 1932) ("It is plain . . . that, where one of the conditions of an indemnity bond is the giving of notice of the loss within an agreed time, if notice is not given within such time, there is no liability on the bond.").  Furthermore, the cases cited by Defendants address notice of *default*. In the immigration bond context, failure to provide notice of a demand to produce the alien results in obvious prejudice, since it is impossible to substantially comply with the terms of the bond by producing the alien if they have not been notified that such a demand has been made. The fact that AAA is the party that actually monitors and delivers the alien provides even more reason to believe that lack of notice to the co-obligor, where requested, would also result in prejudice.

The Agency argues that even if the Bond Contract requires notice to both parties, a bond breach cannot be excused unless Plaintiffs demonstrate that the failure to notify both parties prevented them from substantially complying with the terms of the bond.  Specifically, Defendants maintain that the bond breaches should stand unless Plaintiffs can show that, but for the Agency's failure to notify both parties, Plaintiffs would have produced the alien.  This argument is unavailing given the Court's finding that notice to both parties is a condition

precedent to Plaintiffs' performance.  Defendants reliance on *International Fidelity Ins. Co. v. Crosland*, 516 F. Supp. 1249 (S.D.N.Y. 1981), is misplaced because the court in *Crosland* was considering the Agency's interpretation of a regulation that did not require advance notice to the surety.

Parties also quarrel over who had the burden to prove that notice was mailed.  The briefing on this issue does not appear to fully take into account the nature of the Agency's process for breaching a bond and the Court's standard of review.  The Court will further discuss this matter when considering the so-called "No Notice" bonds.  *See* discussion, *infra*, Part VII(B)(1).

In sum, Defendants are required to send notice of a demand to deliver the alien to both the obligor and the co-obligor if the I-352 Bond Contract indicates that notice should be addressed to both.

### 2.      I-323 Notice of Breach

Plaintiffs also contend that DHS' failure to provide notice of an alleged breach within 180 days renders the bond breach ineffective.  The Agency is required to "send notice of a breach of the bond to the obligor on Form I-323, Notice-Immigration Bond Breached, at the address of record."  I-352 General Terms and Conditions; *see also* 8 C.F.R. § 103.6 (a district director "shall notify the obligor on Form I-323" of a declaration of a bond breach).  Any notice of a breach "sent more than 180 days after the date of the breach shall be unenforceable."  The bond contract clarifies, however, that failure to send the I-323 form within 180 days:

> shall have not [sic] effect on the status of the bond; i.e., the bond shall remain in
> full force until and unless properly canceled.  In the case of a delivery bond, INS
> may, unless otherwise precluded by law, send a new timely demand to produce
> the alien and then breach the bond again if the obligor fails to produce the alien.

(I-352, General Terms and Conditions.)

Defendants do not contest that notice sent more than 180 days after the date of the breach is unenforceable, but they do argue that the bond contract does not require them to send such notice to both Safety National and AAA.  Defendants' arguments that Plaintiffs cannot use failure to give notice as a defense against recovery without showing prejudice or damage are somewhat more persuasive in the context of notice of a bond *breach*, which is more similar to a notice of default, than in the context of notice of a demand to deliver the alien.  *See, e.g., Conesco Industries, Ltd.*, 627 F.2d 312, 317, n. 6; *New Amsterdam Cas. Co.*, 16 F.2d at 851-52. Nonetheless, the language of the Bond Contract clearly provides that notice of a breach sent more than 180 days after the breach is unenforceable and requires that notice to be sent to the "address of record."  Where a surety has indicated that notice is to be sent to "both" the obligor and the co-obligor, the checked box clarifies the meaning of notice and the term "address of record."  Thus, the Agency can only comply with its clearly expressed obligation to provide notice within 180 days by sending that notice to both the obligor and the co-obligor if the "both" box is checked.

### B.      Defense No. 2: "Untimely Removal"

Plaintiffs allege that failure to deliver an alien is excused where DHS did not demand delivery of the alien within 90 days of a final removal order pursuant to 8 U.S.C. § 1231. According to Plaintiffs, because this statute and related regulations are implied into the terms of the bond contract, and because the I-352 General Terms and Conditions contemplate that the bond will be canceled based on "other circumstances as provided by statute and regulation," if the Agency does not comply with § 1231, the bond is cancelled.  Defendants argue that § 1231, at most, only limits the Agency's detention authority and contend that the statute and relevant regulations contemplate supervision of an alien by bond beyond the 90-day period.

31

Section 1231 allows DHS to detain an alien for up to 90 days pending deportation after an order of removal becomes administratively final.  8 U.S.C. § 1231 (a)(1)(A) ("Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days.").  During the 90-day removal period, the statute presumes that the alien will be detained.  8 U.S.C. § 1231(a)(2).  The removal period may be extended if, *inter alia*, the alien "conspires or acts to prevent the alien's removal subject to an order of removal."  8 U.S.C. §1231(a)(1)(C).  An alien may be subject to supervision if he or she is not removed within the 90-day period; such supervision may include a requirement that the alien appear periodically before an immigration officer.  8 U.S.C. § 1231(a)(3).  The Supreme Court has also held that it is "presumptively reasonable" for DHS to detain an immigrant for up to six months after entry of a final order of removal.  *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001) ("[W]e doubt that when Congress shortened the removal period to 90 days . . . it believed that all reasonably foreseeable removals could be accomplished in that time.  We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months.").

Plaintiffs argue that, if the Agency fails to remove an alien within the 90-day removal period, the immigration bond automatically cancels because the Agency no longer has the power to detain the alien.  Plaintiffs' argument fails for several reasons.  First, the Supreme Court itself has recognized that DHS has presumptive detention authority for at least six months.  Second, the Agency may have detention authority beyond the 90-day removal period if the alien acts to prevent his own removal, § 1231(a)(1)(C), or if the alien has been "determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period," § 1231(a)(6).  Plaintiffs maintain that Defendants must send a Notice of Failure to Comply before extending the removal period, but the relevant

regulations indicate that the Agency must do so only where an alien is in detention.  *See* 8 C.F.R. § 241.4(g)(1)(ii), (g)(5).  Finally, the statute has been interpreted to allow the Agency to condition a post-removal-order immigrant's release from detention upon the posting of a bond. *See Shokeh v. Thompson*, 369 F.3d 865, 870-71 (5th Cir. 2004), vacated as moot, 375 F.3d 351 (5th Cir. 2004)("Although the statute authorizing terms of supervision, 8 U.S.C. § 1231(a)(3) and (6), does not expressly authorize a bond, it does not exclude such a condition."); *see also Doan v. INS*, 311 F.3d 1160, 1161 (9th Cir. 2002).  This finding distinguishes the Eighth Circuit's interpretation of an earlier version of the statute, 8 U.S.C. § 156, and that Circuit's conclusion that the Agency could not require an alien to post bond after the Agency's detention authority expired.  *Shrode v. Rowoldt*, 212 F.2d 810, 812-14 (8th Cir. 1954) ("When a party is required to post bail his sureties in effect become his jailers and the power to require bail connotes the power to imprison in the absence of such bail.").  Thus, the Agency may have detention authority beyond the 90-day removal period, and even if it does not, it may still be able to supervise or demand delivery of an alien after that period has expired.  Section 1231 does not, therefore, require a bond to be automatically cancelled after the 90-day removal period has expired. [26]

### C.    Defense Nos. 3, 4:  Alien Granted Voluntary Departure; Alien Granted Voluntary Departure with Requirement to Post Voluntary Departure Bond

The Bond Contract explains that "the [e]xecution of a voluntary departure bond for an alien cancels any existing delivery bond posted on behalf of the same alien."  I-352, General Terms and Conditions.  Thus, a bond is cancelled if an alien is granted voluntary departure with the requirement to post a voluntary departure bond and that bond is executed.  The Bond Contract makes no mention of what happens when an alien is granted voluntary departure in a

---

[26] Plaintiffs point to *Ulysse v. Department of Homeland Sec.*, 291 F.Supp.2d 1318 (M.D.Fla. 2003) in support of their argument.  The court in *Ulysse* found that the agency lacked authority to detain an alien 90 days after an order of removal becomes administratively final.  The *Ulysse* court noted, however, that there was no evidence in the record to suggest "any reason to suspend the removal period, pursuant to 8 U.S.C. § 1231(a)(1)(C)."  *Ulysse*, 291 F. Supp. 2d at 1326.  Furthermore, the *Ulysse* court did not address the question of whether the agency could require a supervisory bond or demand delivery of an alien after the removal period had expired.

removal proceeding *without* the requirement of a voluntary departure bond.  Plaintiffs contend that under such circumstances, the bond is cancelled.

An alien may be granted voluntary departure at two different moments in the removal process.  First, voluntary departure may be granted "in lieu of being subject to" removal proceedings or "prior to the completion of such proceedings."  8 U.S.C. § 1229c(a)(1).  In such a case, the immigration judge "*may* require an alien . . . to post a voluntary departure bond, to be surrendered upon proof that the alien has departed the United States within the time specified."  8 U.S.C. § 1229c(a)(3) (emphasis added).  Second, an alien may be allowed to voluntarily depart the United States at the conclusion of removal proceedings.  8 U.S.C. § 1229c(a)(3).  In the second case, the alien "*shall* be required to post a voluntary departure bond, in an amount necessary to ensure that the alien will depart, to be surrendered upon proof that the alien has departed the United States within the time specified."  8 U.S.C. § 1229c(b)(3) (emphasis added).  In either situation, the immigration judge must also enter an alternate order of removal.  8 C.F.R. § 241.5(d).  Unless an extension of time to depart is granted or voluntary departure is reinstated, 8 C.F.R. § 241.5(f),(h), an alien who fails to voluntarily depart in the time granted becomes automatically removable.  8 C.F.R. § 241.5(d), 8 C.F.R. § 1240.26(b).  It seems that the agency could, at that point, again demand delivery of the alien and possibly detain the alien.[27]

The I-352 sets forth a specific list of events that result in cancellation of the bond, including issuance of a voluntary departure bond, and that list does not include a grant of voluntary departure, standing alone.  The reference to the bond being "otherwise cancelled" in section G(1) would seem most likely to refer back to the list of reasons for cancellation set forth in the Terms and Conditions of the bond.

---

[27] Even if, for some reason, the Agency's detention authority were construed to cease after a grant of voluntary departure, the agency would still be authorized to supervise the alien.  *See Shokeh*, 369 F.3d at 870-71; *Doan*, 311 F.3d at 1161.

The Court has already explained why Plaintiffs may not rely on the guidance set forth in the Amwest Memorandum.[28]  Even if the Court were to find that the Agency had a consistent policy of extending the Amwest I Settlement provisions to all sureties, the policy statements attached to the Amwest I Settlement do not state that a bond should be cancelled upon a grant of voluntary departure without the requirement of a voluntary departure bond.

The Court therefore agrees that Defendants could reasonably determine that a delivery bond did not cancel when an alien was granted voluntary departure without the issuance of a new voluntary departure bond.

### D.  Defense No. 5: Bonds Where the Alien Voluntarily Departed the Country Prior to the Delivery Date

A delivery bond is cancelled upon "valid proof of the bonded alien's voluntary departure"  I-352, General Terms and Conditions.  The Board of Immigration Appeals persuasively clarified in *Matter of Peerless Ins. Co*:

> [T]he burden of proof to establish that the alien actually left the United States before the date set for his surrender rests with the obligor when he fails to produce the alien pursuant to a proper and timely demand made upon him.  To place the Service in a position of having to prove that he did not so depart would constitute an unreasonable and unnecessary impediment to the administration of justice and the immigration laws.

15 I.&N. Dec. 133, 134 (B.I.A. 1974).  Thus, if the administrative record reflects valid proof of the alien's departure, the agency's declaration that a bond was breached would be arbitrary and capricious.  If, however, the record does not contain valid proof that the alien departed prior to the date that the alien failed to appear, the Agency is entitled to find the bond breached.

### E.  Defense No. 6:  FOIA

---

[28] Even the Amwest Memorandum, which stated clearly that "granting of voluntary departure in a removal proceeding without the requirement of a voluntary departure bond" required the cancellation of a bond, also noted that "The IIRIRA language concerning voluntary departure raises many complex issues concerning both bonds and authority to detain which are beyond the scope of this memorandum since they did not exist at the time of the Settlement."  (Amwest Memorandum 4-5.)  Thus, even if the Court were to give some weight to the Amwest Memorandum, it is not at all clear that the Memorandum purports to interpret the *current* statutory requirements.

Plaintiffs maintain that compliance with the Freedom of Information Act is a material term of the bond contract and that DHS's failure to comply with FOIA therefore excuses Plaintiffs' performance.  An agency's relevant regulations are an implied part of a bond contract, *see, e.g.*, *Bodek v. Dept. of Treasury*, 532 F.2d 277, 279 n.7 (2d Cir. 1976); *Wolak v. United States*, 366 F. Supp. 1106, 1112 (D. Conn. 1973), and  "[t]he laws existing at the time a contract is made becomes a part of the contract and governs the transaction." *Texas Nat'l Bank v. Sandia Mortgage Corp.,* 872 F.2d 692, 698 (5th Cir. 1989).  Plaintiffs point to no authority, however, compelling the conclusion that failure to comply with an unrelated statute can be considered a material breach of a government contract and thus excuse another party's failure to perform on that contract.

The Court agrees that Defendants are required by law to comply with FOIA and Plaintiffs may have an independent cause of action if Defendants fail to meet their statutory obligations.  Furthermore, under certain circumstances, a court may enjoin agency action pending the resolution of a FOIA claim.  *See Renegotiation Board v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 19-20 (1974); *Lewis v. Reagan*, 660 F.2d 124, 128 (5th Cir. 1981) (finding that "a district court has jurisdiction to enjoin agency action for violation of an [sic] FOIA claim" but noting that "such intervention requires a clear showing of irreparable injury.").  In the case of the bond breach determinations before the Court, Defendants have provided all documents related to the bonds.  Any FOIA claim related to these bonds is, therefore, moot.  Even though the court may have equitable jurisdiction pursuant to § 552(a), *see Renegotiation Board*, 415 U.S. at 20, the Court does not find it appropriate to recalculate the interest on the bonds to the date the responsive documents were made available to the Plaintiffs as a sanction for DHS's lack of good faith in responding to FOIA requests.

The Court recognizes that the Agency's failure to comply with FOIA requests has made it more difficult for Plaintiffs to ascertain whether bonds were properly breached and to support their defenses before the Agency. Plaintiffs have not convinced the Court, however, that no alternative forms of proof were available for most defenses.

### F.      Defense No. 7:  Mitigation Bonds

Plaintiffs contend that they are entitled to mitigation on four bonds because the aliens were surrendered into DHS custody shortly after the delivery date. The Bond Contract provides:

> If the obligor or surety delivers the bonded alien within 10 days of the date of the breach, the obligor or surety shall receive a mitigation of 66.67% of the bond principal. If the obligor delivers the bonded alien within 20 days of the date of the bond breach, the obligor or surety shall receive a mitigation of 50% of the bond principal. If the obligor or surety delivers the bonded alien within 30 days of the bond breach, the obligor or surety shall receive a mitigation of 30% of the bond principal. . . .

I-352, Mitigation. If the obligor elects to mitigate damages, it "must give the appropriate INS office written notice of delivery not less than 72 hours prior to delivering the bonded alien." *Id.* Written notice "may be waived by the District Director or the District Director's designee in the appropriate circumstance." *Id.* The Bond Contract is crystal clear on mitigation, and thus the only question about mitigation arises in the application of this provision to the facts of the four bonds at issue. The Court will discuss each of those bonds in turn.

### G.      Defense No. 8:  Bonds Resolved by Settlement Agreement

Plaintiffs claim that they are entitled to summary judgment on three of the bonds at issue because they were cancelled pursuant to a 2004 Settlement Agreement between the parties. Defendants argue that the Court does not have jurisdiction to entertain this defense because the settlement is not final agency action for purposes of the APA and because the Court has no independent jurisdiction to enforce the terms of the settlement agreement.

"The federal government is immune from suit unless it consents to be sued."  *First Nat.*

*Bank v. Genina Marine Services, Inc.*, 136 F.3d 391, 394 (5th Cir. 1998).  "The United States

can consent to be sued either by specific statutory consent or by instituting a suit as to which a

defendant may plead matters in recoupment." *Id.* (internal quotation marks and citation omitted);

*see also* AM. JUR. 2D *Counterclaim* § 71 ("By instituting a civil action, the United States subjects

itself to a setoff or recoupment claim that arises out of the same transaction or occurrence as the

original claim and seeks to reduce or defeat the government's recovery.").  In *Frederick v.*

*United States*, the Fifth Circuit explained:

> [W]hen the sovereign sues it waives immunity as to claims of the defendant
> which assert matters in recoupment—arising out of the same transaction or
> occurrence which is the subject matter of the government's suit, and to the extent
> of defeating the government's claim but not to the extent of a judgment against
> the government which is affirmative in the sense of involving relief different in
> kind or nature to that sought by the government or in the sense of exceeding the
> amount of the government's claims; but the sovereign does not waive immunity
> as to claims which do not meet the 'same transaction or occurrence test' nor to
> claims of a different form or nature than that sought by it as plaintiff nor to claims
> exceeding in amount that sought by it as plaintiff.

386 F.2d 481, 488 (5th Cir. 1967); *see also Pennsylvania R. Co. v. Miller*, 124 F.2d 160, 162

(5th Cir. 1941) (noting that the defense of recoupment "is a doctrine of an intrinsically defensive

nature founded upon an equitable reason, inhering [in] the same transaction, why the plaintiff's

claim in equity and good conscience should be reduced.").  The definition of recoupment

includes "[t]he withholding, for equitable reasons, of all or part of something that is due."

BLACK'S LAW DICTIONARY (8th ed. 2004).  The Fifth Circuit has emphasized that "there can be

no recoupment if the damages claimed by the defendant arise from the breach of an independent

contract or from an independent wrong unconnected with the plaintiff's cause of action. . . ."

*Equal Employment Opportunity Commission v. First Nat'l Bank of Jackson*, 614 F.2d 1004,

1008 (5th Cir. 1980) (refusing to allow Plaintiff's counterclaim because its connection to the

EEOC's suit was "too tenuous and indirect to warrant the innovation of the doctrine of recoupment." (internal citation omitted)).

Defendants have counterclaimed against Plaintiffs, asking the Court to enter judgment in the amount of $9,255,750.00 plus interest, penalties, and handling charges, an amount that Defendants allege is owed on the breached bonds. (Defs' Countercl. 16.) Although Defendants seek to enforce DHS' administrative determinations and have not sued on the Settlement Agreement, it appears that Plaintiffs would be entitled to assert as a defense to this claim that Plaintiffs do not owe said amount because certain bond breaches that Defendant now seeks to enforce were subsequently settled. To the extent such a defense might be construed as a claim for recoupment, it certainly would seem to arise out of the same "occurrence which is the subject matter of the government's suit."

Unfortunately, the question of which bonds were actually settled as part of the 2004 Settlement Agreement is hotly disputed. The Agreement first notes that "the unpaid penal amount of the Subject Invoices set forth on Exhibit 'A,' excluding penalties and interest, totals $3,652,250. (Settlement Agreement ¶ 1, Jt. Appx. 0629-0630.) Pursuant to the Settlement Agreement, Plaintiffs agreed to pay "$525,000 down as a good faith deposit on this compromise, and . . . the balance of $2,214.187.50." (Settlement Agreement ¶ 2, Jt. Appx. 0630.) The Agreement clarifies:

> This represents the Parties' good faith determination of Safety National's and AAA Bonding's actual liability for the total of the amounts of the Subject Invoices set forth on Exhibit 'A.' Upon receipt of the consideration set forth herein, DHS agrees to notify its finance and billing department immediately that [Plaintiffs] have made full payment for all of the Subject Invoices listed on Exhibit 'A,' and therefore have no further liability in connection with these bonds, invoices, and breaches.
>
> As to all of the Subject Invoices set forth on 'Exhibit A', DHS hereby released Safety National and AAA Bonding . . . from any and all claims arising out of or in any manner related to the posting, breaching, and/or invoicing of all bonds which are being satisfied and released pursuant to this Agreement, and the Parties to this

Agreement agree that all obligations between the Parties pertaining to all of the immigration bonds which are the subject of this Agreement have been fully satisfied.

(Settlement Agreement ¶¶ 2, 3, Jt. Appx. 0630.)  The Settlement Agreement also includes a clause providing that the Agreement "embodies the complete understanding of the Parties with respect to the matters addressed in this Agreement" and that with respect to such matters there "are no other promises, terms, conditions, communications, representations, or obligations, either oral or in writing, which are completely subsumed by the terms of this Agreement."  (*Id.* § 6.)

Three of the disputed bonds before the Court are listed in Exhibit A.  (JSOF 4, 8, 19.) The "penal due" and "current due" amounts for these three bonds in the same exhibit is listed as "$0."  Defendants argue vigorously that the Agreement only settled "invoices" and that the anything with a $0 amount cannot be considered an "invoice."  Unfortunately, the terms of the Agreement seem clear:  Plaintiffs were released from claims as to *all* invoices set forth in Exhibit A.  Though it does admittedly seem unusual, the Court is not aware of any reason why an "invoice" could not be issued in the amount of $0.

Defendants present several affidavits and other documents to demonstrate that the parties did not, in fact, intend to settle these three bonds and to show that the Agency does not issue invoices for $0.  The Court may not look to this parole evidence, however, because the terms of the contract are unambiguous.  *See United States  v.  Waterman S. S. Corp.*, 397 F.2d 577, 579 (5th Cir. 1968) ("Where the terms of the contract are unambiguous the determination of its meaning is a question of law and should be decided without resort to extrinsic evidence.").  Defendants' further argument that this interpretation leads to the conclusion that DHS lacked authority to enter into the Settlement Agreement is similarly unavailing.  Defendants maintain that DHS lacks authority to settle any bond for no consideration.  Even if this were true, nothing in the Agreement itself suggests that that no consideration was paid to settle the three disputed

bonds.  Instead, the Settlement Agreement sets forth a global sum that Plaintiffs were to pay in consideration for release of all claims on the totality of the bonds set forth in Exhibit A.

**H.**     **Defense No. 9:  Run Letter Bonds**

In addition to sending an  I-340 notice demanding delivery of an alien to the bonding companies, DHS also sends notice of the delivery date to the alien.  According to Plaintiffs, this form is also referred to as a "run letter" because it creates a risk that the alien will leave town before the delivery or deportation date.   The I-352 Bond Contract appears to acknowledge this risk, stating that "no demand to produce the bonded alien for deportation/removal shall be sent less than three days prior to sending notice to the bonded alien."  I-352, General Terms and Conditions.  This statement is not included in the list of events that automatically cancel a bond. The Bond Contract also clearly states, however, that a delivery bond is breached when the obligor fails to produce the alien in response to "a *timely* demand."  I-352, General Terms and Conditions (emphasis added).  The Court looks to the language of the contract as a whole to determine the meaning of "timely."  Although Defendants argued in their Motion for Summary Judgment that Plaintiffs' "Run Letter" defense was premised solely on the Amwest Settlements and Memorandum, they later recognized that the Bond Contract itself states unequivocally that no demand to produce an alien will be sent less than three days prior to sending notice to the alien.  Under the clear language of the bond, where the agency fails to do so, it has not made a timely demand, and the bond has not been breached.[29]

**I.**     **Defense No. 10:  No Questionnaire Bond**

---

[29] Defendants argue that Plaintiffs must prove that the "Run Letter" prevented them from delivering an alien in order for the Court to find that the bond was not breached.  Given that a timely demand is a condition precedent to Plaintiffs' performance, however, this argument is unavailing.

Plaintiffs argue that a bond must be cancelled if the Agency fails to send a questionnaire with the I-340 Notice to Deliver Alien. Neither the Bond Contract nor any relevant regulations mention such a questionnaire.

Plaintiffs claim that the Amwest I Settlement and Amwest Memorandum make clear that the "timely notice" required by the Bond Contract includes the attachment of a completed questionnaire to every I-340. A policy statement attached to the Amwest I Settlement provided "A questionnaire prepared by the surety with approval of INS will be completed by INS whenever a demand to produce a bonded alien is to be delivered to the surety." [30] (Jt. Appx. 691.) The record also includes a telegraphic message, dated August 12, 1997, from the Acting Executive Associate Commissioner of the Office of Field Operations to, *inter alia*, all regional directors, stating that an attached questionnaire "must be completed and attached to every demand sent to a bond obligor." (Jt. Appx. 703.) The document further explains, "since this questionnaire fulfills one of the requirements agreed to in the Amwest/Far West settlement and has nationwide application, there are no exceptions to this instruction because any breached bond appeal based on a demand which does not have a questionnaire attached is subject to recession." (*Id.*) Neither party has explained the provenance or fate of this document. The record reflects that the Agency generally does send a questionnaire with the I-340 form. The Administrative Appeals Office has also has frequently commented that "[t]he present record contains evidence that a properly completed questionnaire . . . was forwarded to the obligor . . . pursuant to the

---

[30] The Amwest Memorandum further explained:
> [INS] agreed to work with the Plaintiffs to develop a questionnaire, or bond breach worksheet, which it would complete and attach to every I-340. A copy of this worksheet and the wire directing its use is attached as Attachment D. Any office not already doing so shall immediately begin attaching a completed copy to every I-340 served on a bond obligor. . . . Failure to comply with the requirement is a valid ground for appealing a breach, but the surety must raise the issue expressly.

(Jt. Appx. 667.) The Court has found that it cannot consider the Amwest Memorandum as Agency policy, however.

Amwest/Reno  Settlement Agreement."  *See, e.g.  In re Obligor*, 2005 WL 2271462 (INS May 3, 2005); *see also* Jt. Appx. 0355; Jt. Appx. 0580; Jt. Appx. 0609.

The Agency admits that field offices will "sometimes prepare a questionnaire for delivery to the surety along with the Form I-340" but contends in a sworn statement that sending the questionnaire is "not required by statute, policy, or regulation."  (Wells Decl. ¶ 1.)  The Agency also insists that "[t]he questionnaire is only prepared for what ever [sic] assistance it may give to the surety and does not replace the surety's responsibility to keep track of the alien."  (*Id.*)

 Sudden or unexplained change in a consistent Agency policy may render an agency's decision arbitrary and capricious.  *See Smiley v. Citibank (S.D.)*, 517 U.S. 735, 742 (1996).  However, the Court does not think that it is possible, on this record, to piece together a consistent Agency policy to cancel or rescind a bond breach if a questionnaire is not sent to a surety along with an I-340 notice.  The only documents suggesting that failure to send a questionnaire is a valid grounds for appeal is the August 1997 memorandum.  The Court is not at all certain that this statement by the Acting Executive Associate Commissioner of the Office of Field Operations should be construed as general Agency policy.  Even if the Court were to conclude that the Agency had a policy of extending the provisions of the Amwest I Settlement to all sureties as a matter of policy and fairness, the text of the Amwest I Settlement does not make clear that failure to send a questionnaire with a demand to produce the alien necessarily renders a bond breach unenforceable.  Furthermore, the Agency has provided a sworn statement, which carries the penalty of perjury, indicating that no such policy existed.

The Court concludes, therefore, that the Agency's failure to send a questionnaire with a declaration of a bond breach does not, at least on this record, constitute a valid defense to a bond breach determination.

**J.        Defense No. 11:  Substantial Compliance**

Plaintiffs argue that they substantially complied with the conditions of one of the bonds before the Court. 8 C.F.R. § 103.6(e) ("A bond is breached when there has been a substantial violation of the stipulated conditions."). The bond at issue has been cancelled by the Agency, however, and Plaintiffs argument is therefore moot.

### K.    Defense No. 12:  Bond Cancelled

Because the Agency has cancelled certain bonds through the ADR process, those bonds are now moot.

### L.    Defense No. 13:  Bond on Appeal

Plaintiffs initially claimed that they were entitled to summary judgment on one bond the Agency claimed was due and owing because that bond was on appeal. According to Defendants, this bond (JSOF 47) is now ripe for the Court's review because the AAO dismissed Plaintiffs' appeal on May 30, 2007. The Court will consider this bond on the merits. The Court does take note of the fact, however, that the Agency had improperly attempted to invoice Plaintiffs for this bond before the appeal had been decided.

## VII.   INDIVIDUAL BOND BREACH DETERMINATIONS

### A.    Summary Judgment for Defendants

The Court has reviewed the submissions regarding each individual bond breach determination. For the reasons provided in Part VI, the Court finds, without further discussion, that Defendants are entitled to summary judgment on the following bonds because Plaintiffs' alleged defenses cannot succeed and the agency's decision was therefore not arbitrary or capricious or otherwise contrary to law:

- o **Valladeres-Llanes, Edexol,** defense asserted: FOIA (JSOF 9);
- o **Antonio-Recio, Rafael**, defenses asserted: untimely removal, FOIA (JSOF 14);
- o **Ruiz-Cruz, Isau Nectaly**, defenses asserted: untimely removal, FOIA (JSOF 18);
- o **Jarama-Tacuri, Isabel**, defense asserted: untimely removal (JSOF 20);
- o **Calderon-Morales, Ramiro Francisco**, defenses asserted: untimely removal, FOIA (JSOF 22);

- o **Nataven-Henriquez, Elvin Osman**, defense asserted: untimely removal (JSOF 25);
- o **Reyes, Raul Osberto**, defense asserted: FOIA (JSOF 27);
- o **Martinez-Ferrera, Tomas**, defenses asserted: untimely removal, voluntary departure without bond, FOIA (JSOF 28);
- o **Delmar-Gordio, Aguilar**, defenses asserted: untimely removal, FOIA (JSOF 29);
- o **Morales-Paz, Floridalma**, defense asserted: FOIA (JSOF 31);
- o **Martinez-Trochez, Karina Rosangel**, defense asserted: FOIA (JSOF 32);
- o **Martinez-Menendez, Fidelino**, defense asserted: FOIA (JSOF 33);
- o **Gomes-Pinho, Debora Cristina**, defense asserted: untimely removal (JSOF 35);
- o **Galvez-Rivera, Claudia Yanina**, defense asserted: no questionnaire (JSOF 45);
- o **Reyes-Alvarez, Claudia Johana**, defense asserted: FOIA (JSOF 49).

Parties agree that the following bond was properly declared in breach, and Defendant's Motion for Summary Judgment on this bond is therefore **GRANTED**:

- o **Escobar, Luis Alberto** (JSOF 30)

Defendants are also entitled to summary judgment on the following bonds, which do merit further discussion:

### 1.    Melendez-Martinez, Alberto (JSOF 6)

Plaintiffs claim that this bond should have been cancelled because Mr. Melendez-Martinez was granted voluntary departure and *was* required to post a voluntary departure bond.[31] As explained in Part VI(C), the Bond Contract states that "the [e]xecution of a voluntary departure bond for an alien cancels any existing delivery bond posted on behalf of the same alien." I-352, General Terms and Conditions. Mr. Melendez-Martinez was granted voluntary departure by an Immigration Judge (IJ) on July 12, 2002 with an alternate order of removal to take effect if he failed to depart. (Jt. Appx. 061.) The IJ's order indicates that the application for voluntary departure was granted upon posting a bond in the amount of $3,000. (*Id.*) The transcript of the July 12, 2002 hearing also states the following:

> IT IS FURTHER ORDERED that the respondent post a departure bond in the amount of $3,000 with the Immigration Service within five business days. In

---

[31] Plaintiffs also aruge that DHS improperly breached this bond based on defenses of "untimely removal." The Court has already determined that Plaintiffs cannot succeed on their "untimely removal" defense. *See* discussion *supra* Part VI(B).

> light of the fact that the respondent has already posted the $3,000 to ensure his appearance, at the removal proceedings, the Court will take that as the money for the bond as the departure bond required for voluntary departure.

(Jt. Appx. 006.)  The Agency declared Plaintiffs' delivery bond breached after Plaintiffs failed to deliver Mr. Melendez-Martinez on January 2, 2004.[32]  Plaintiffs appealed, and, on April 15, 2004, the Administrative Appeals Office (AAO) upheld the breach determination.  (Jt. Appx. 053-056.)  The AAO found that no voluntary departure bond was posted, and thus, the delivery bond remained in effect.  (Jt. Appx. 053-056.)

The Court finds that the AAO's decision was not arbitrary and capricious or otherwise contrary to law because the AAO considered the relevant factors and because there is a rational relationship between the facts found and the decision made.  *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *Overton Park*, 401 U.S. at 416; *see also Sierra Club v. Peterson*, 185 F.3d 349, 365-66 (5th Cir. 1999), and because the decision was not otherwise contrary to law.  The Bond Contract states that the bond is cancelled upon *execution* of a voluntary departure bond.  There is no evidence in the record that any new voluntary departure bond was posted or executed in this case.  Furthermore, based on a somewhat confusing and contradictory record from the IJ, the AAO could have reasonably found that the IJ essentially chose to keep the existing departure bond in place and did not actually require Mr. Melendez-Martinez to post a new voluntary departure bond.[33]  Defendants' Motion

---

[32] Presumably, Mr. Melendez-Martinez did not voluntarily depart.

[33] Notably, Plaintiffs themselves asserted in a brief to the AAO that Mr. Melendez-Martinez was granted voluntary departure *without* the requirement of a voluntary departure bond.  In briefing on the pending motions, Plaintiffs seem to assert a similar defense, in the alternative.  The Court has found that this defense, which was not stated in the JSOF as to this bond, cannot succeed.  *See* discussion *supra* Part VI(C).  The Court further notes that it would seem to be inappropriate for an IJ to somehow take money from a delivery bond and "apply" it to a new voluntary departure bond.  A voluntary departure bond imposes obligations on the surety and co-obligor not undertaken as part of a delivery bond.  For example, a voluntary departure bond is breached when the obligor "fails to provide valid proof that the bonded alien departed the United States on or before the date specified in the order . . . within 30 days of that date."  I-352, General Terms and Conditions.

for Summary Judgment on this bond is therefore **GRANTED** and Plaintiffs' Motion is therefore **DENIED**.

### 2.     <u>Portillo-Garcia, Roberto (JSOF 3)</u>

Plaintiffs argue that they are entitled to summary judgment on this bond because Defendants did not provide Plaintiffs with I-340 or I-323 notice.[34]  For the following reasons, Plaintiff's lack of notice defenses fails as to this bond.

In the case of this bond, the address provided for the obligor (Safety National) and the agent on the I-352 form was the same.  The record reflects that both an I-340 demand to deliver alien and an I-323 notice was sent to that address.  The record also reflects that those forms were returned to sender as undeliverable.  (Jt. Appx. 019, 023.)  Plaintiffs claim in their Motion for Summary Judgment that the Agency had notice of the agent's new mailing address, (Pls.' Partial Mot. Summ. J. 22), but direct the Court to no evidence in the summary judgment record to that effect.  Where the Agency attempts to provide notice to the address on the I-352 form in conformance with 8 C.F.R. § 103.5a(a)(2), an immigration bond may be considered properly breached even if the notice is returned.  *See United States v. Minnesota Trust Co.*, 59 F.3d 87, 89-91 (8th Cir. 1995).  The district director's bond breach determination must, therefore, be upheld, because there is a "'rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs. Ass'n of the United States, Inc.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc*, 371 U.S. at 168, because the decision was "based on a consideration of relevant factors," *Overton Park*, 401 U.S. at 416; *see also Sierra Club*, 185 F.3d at 365-66, and because the decision was not otherwise contrary to law.  Plaintiffs' Motion for Summary Judgment as to this bond is, therefore, **DENIED** and Defendants' Motion for Summary Judgment is **GRANTED**.

---

[34] For the reasons set forth above, Plaintiffs cannot succeed on their "untimely removal" defense as to this bond.  *See* discussion *supra* Part VI(B).

### 3.      Almendares-Calederon, Jeannett de Lourdes (JSOF 21)

Plaintiffs argue that the Agency's bond breach should be cancelled because they did not receive I-323 notice of the breach.[35]  Plaintiffs filed what can be fairly construed as a Motion to Reconsider the bond breach determination on January 20, 2005.  (Jt. Appx. 2611-12.)  In that Motion, Plaintiffs alleged that the bond breach should be cancelled because removal was not timely.  (*Id*.)  Plaintiffs did not raise the issue of notice.  The Court has found that issue exhaustion is required when Plaintiffs file a Motion to Reconsider.  *See* discussion *supra* Part IV(D).  Plaintiffs cannot argue that it would have been futile to raise a defense that *neither* party received I-323 notice of the bond breach determination.  The Court therefore finds Plaintiffs' no notice argument was waived.

Plaintiffs' Motion for Partial Summary Judgment is therefore **DENIED**, and Defendant's Motion for Summary Judgment is **GRANTED**.

### 4.      Mitigation Bonds

#### a.      Morocho-Palaguachi, Manuel Belen Maria (JSOF 7)

Plaintiffs claim that they are entitled to mitigation on this bond because Ms. Morocho-Palaguachi was surrendered into custody within 30 days of the bond breach.[36]  Plaintiffs' claim for mitigation fails.  *See* discussion *supra* Part VI(F).

On appeal, the AAO noted that Plaintiffs did not provide evidence that the alien was, in fact, in ICE custody on February 11, 2004.  The record before the Court includes an Agency document with a stamp indicating that Ms. Morocho-Palaguachi was surrendered on that date.[37]  (Jt. Appx. 070.)  Defendants now appear to concede in briefing on the pending motion that

---

[35] Plaintiffs cannot succeed on their "untimely removal" defense to this bond breach.  *See* discussion *supra* Part VI(B).

[36] Plaintiffs "untimely removal" defense to this bond breach determination cannot succeed.  *See* discussion *supra* Part VI(B).

[37] Parties have not clarified whether this document was part of the record before the AAO at the time of the appeal, and the Court can only assume it was not.  Nor have defendants attempted to explain *why* it was not part of the file before the AAO.

Plaintiffs did, in fact, surrender Ms. Morocho-Palaguachi on that date.  (Defs.' Mot. Summ. J. 43.)  The AAO held, however, that even if it were to assume that Ms. Morocho-Palauachi was in DHS custody on February 11, 2004, the breach determination would still be upheld based on Plaintiffs' failure to surrender the alien on the actual delivery date.  Mitigation is not actually a defense to a bond breach.  The AAO's decision that a failure to surrender the alien on the delivery date constituted a substantial violation of the terms of the bond contract was not arbitrary and capricious.

The explicit terms of the I-352 state that "if the obligor elects to deliver the bonded alien to mitigate damages, it must give the appropriate INS office written notice of delivery not less than 72 hours prior to delivering the bonded alien" unless the District Director or her designee waive such notice.  Plaintiffs do not claim that they provided such notice or that the District Director waived that notice.  Plaintiffs are not, therefore, entitled to mitigation on this bond. Defendants' Motion for Summary Judgment as to this bond is therefore **GRANTED** and Plaintiffs' Motion for Partial Summary Judgment is therefore **DENIED**.

### b.      Valdebenito, Hector Octavio (JSOF 10)

Plaintiffs allege that they are entitled to summary judgment on this bond because Defendants breached a material term of the bond contract by failing to respond to their FOIA request.  For the reasons stated above in Part VI(E), Plaintiffs "FOIA" defense cannot succeed.

Plaintiffs also argue that they are entitled to mitigation on this bond because DHS' records reflect that the alien was in custody on March 26, 2002, 11 days after the delivery date of March 15, 2002.  Plaintiffs do not allege that they themselves took Mr. Valdebenito into custody, and the record reflects that he was arrested.  Plaintiffs are not, therefore, entitled to mitigation on this bond.  *See* discussion *supra* Part VI(F).

Plaintiffs' Motion for Partial Summary Judgment as to this bond is therefore **DENIED** and Defendant's Motion for Summary Judgment is **GRANTED**.

### c. Toledo-Menocal, Karyna Elizabeth (JSOF 11)

Plaintiffs argue that they are entitled to mitigation on this bond because DHS has stipulated that the alien was in custody on February 26, 2002, 21 days after the delivery date of February 5, 2002.  There is no evidence in the record that Plaintiffs themselves surrendered Ms. Karyna Toledo-Menocal into custody, and the record only reflects that she "currently detained by INS" on February 26, 2002.  Plaintiffs are not, therefore, entitled to mitigation on this bond.  *See* discussion *supra* Part VI(F).  Plaintiffs' Motion for Partial Summary Judgment as to this bond is therefore **DENIED** and Defendant's Motion for Summary Judgment is **GRANTED**.

### d. Chacon-Alfaro, Lucila (JSOF 24)

Plaintiffs contend that they are entitled to mitigation on this bond because Ms. Chacon-Alfaro was taken into custody on June 13, 2002, only seven days after her June 6, 2002 appearance date.  There is nothing in the record to show that Plaintiffs themselves surrendered Mr. Chaco-Alfaro to INS, and Plaintiffs have not made that precise assertion in briefing. Plaintiffs are not, therefore, entitled to mitigation on this bond.  *See* discussion *supra* Part VI(F). Plaintiffs' Motion for Partial Summary Judgment as to this bond is therefore **DENIED** and Defendant's Motion for Summary Judgment is **GRANTED**.

### B. Summary Judgment Granted for Plaintiffs

Based on the analysis provided in Part VI, *supra*, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED** with respect to the following bonds, which do not require further discussion:

- **Dos Santos-Maria, Dalvani,** bond settled (JSOF 4);
- **Poncio-Tono, Agustin,** bond settled (JSOF 8);
- **Chamagua, Norma Anastacia**, bond settled (JSOF 19).

Plaintiffs are also entitled to summary judgment on the following bonds, which require some further discussion:

### 1. I-340 and/or I-323 Notice Not Provided to Both Safety National and AAA

For the following bonds, there is no evidence in the record before the agency at the time the bond was breached that the Agency mailed a I-340 demand to deliver the alien and/or an I-323 notice of breach to both Safety National and AAA, despite the fact that such notice was requested in the I-352 Bond Contract. Nor is there any evidence in the record that the Agency believed that notice to both was required. The Court has found the Agency's determination that notice to either the obligor or the co-obligor was sufficient, despite the fact that the parties requested notice to both on the I-352 Bond Contract to be contrary to law. *See* discussion, *supra*, Part VI(A).

The Agency's argument that Plaintiffs bear the burden of proving that they did not receive notice is confusing given Defendant's simultaneous contention that the Court can review the Agency's initial breach determination and must determine whether that determination was arbitrary and capricious based on the record before the Agency at the time. Plaintiffs have no opportunity to present evidence to the Agency before a bond is declared breached. If the Court were to review an initial breach determination and were to find no evidence in the record that the Agency provided notice to Plaintiffs, it could not possibly uphold that decision even under the highly deferential arbitrary and capricious standard. Defendants have also informed the Court that Plaintiffs need not exhaust administrative remedies, and thus their argument that Plaintiffs should prove lack of notice on appeal is unconvincing. Furthermore, the Agency's arguments regarding burden of proof are presented for the first time as part of this litigation and were not provided as a reason for the Agency's decision at the time it was made.

Although parties have submitted extensive extra-record documentation and briefing on the factual issues surrounding notice for these bonds, the Court does not believe it should decide these issues.  "When an administrative agency has made an error of law, the duty of the Court is to 'correct the error of law committed by that body, and, after doing so to remand the case to the (agency) so as to afford it the opportunity of examining the evidence and finding the facts as required by law.'" *NLRB v. Enterprise Ass'n of Steam, Hot Water, Hydraulic*, 429 U.S. 507, 522 n. 9 (1977) (citing *ICC v. Clyde S.S. Co.*, 181 U.S. 29 (1901); *see also Pennzoil Co. v. FERC* 789 F.2d 1128, 1136 n. 21 (5th Cir. 1986).  The Agency's breach determination on the following bonds is therefore **VACATED** and the bonds are **REMANDED** for consideration not inconsistent with this order:

- o **Madrid-Juarez, Felix** (JSOF 1);
- o **Martinez-Linares, Maria Magdelena** (JSOF 12);
- o **Jimenez-Gutierrez, Maria** (JSOF 13);
- o **Rangel-Quintanilla, Martha** (JSOF 15);
- o **Flores-Garcia, Esteban Josue** (JSOF 17);
- o **Osorto-Espinal, Melvin Geovani** (JSOF 37);
- o **Peixoto, Maria Figueredo** (JSOF 38);
- o **Alvarenga-Carranza, Kenia Loani** (JSOF 39);
- o **Hernandez-Mejia, Alejandro Josue** (JSOF 40);
- o **Chavarria-Romero, Manuel de Jesus** (JSOF 41);
- o **Baez, Edgar Alberto** (JSOF 42);
- o **Guzman-Serrano, Mario Humberto** (JSOF 43);
- o **Cedillo-Ramos, Jose Rigoberto** (JSOF 47).

### 2.      Arbustine-Diaz, Eric  (JSOF 44)

Plaintiffs argue that DHS violated the terms of the bond by failing to wait 72 hours to send Mr. Arbustine-Diaz a "Run Letter" after it sent the I-340 notice.[38]

As explained in Part VI(H), *supra*, the Bond Contract requires the Agency to send the I-340 demand to surrender alien to Plaintiffs no less than three days prior to sending notice to the alien.  As part of the ADR process, Plaintiffs produced a copy of a Form I-166 "Run Letter"

---

[38]For the reasons set forth *supra* Part VI(E), Plaintiffs' FOIA defense to this bond breach determination cannot succeed.

dated May 27, 2004 and addressed to Mr. Arbustine-Diaz at the address provided for him on the Bond Contract.  Plaintiffs do not clarify how they obtained this letter.  The  I-340 demand to deliver alien is dated the same day:  May 27, 2004.  (Jt. Appx. 576.)  Defendants argue that the letter was not part of the administrative record and seem to suggest that it may not have been sent to Mr. Arbustine-Diaz.  The Agency's own Field Manual indicates that the Record of Proceeding for Bond Breach Cases should contain a copy of the Form I-166.  (Jt. Appx. 058).  There is reason to believe, therefore, that the administrative record was incomplete when the AAO made its decision on this bond and that the Agency did not consider all of the relevant factors when determining that the bond had been breached.  Any fact dispute regarding this document can be addressed by the Agency on remand.  Defendant's Motion for Summary Judgment is therefore **DENIED** and Plaintiffs' Motion for Summary Judgment is **GRANTED** as to this bond.  The bond breach determination is **VACATED** and **REMANDED** to the agency for consideration not inconsistent with this opinion.

### 3.        Hernandez, Maria Nubia (JSOF 16)

Plaintiffs argue that the Agency's decision to declare this bond breached was arbitrary and capricious because *neither* Safety National nor AAA received I-323 Notice of the bond breach.[39]

The record includes an I-323 Notice of Breach that has the words "certified mail" at the top.  (Jt. Appx. 214.)  There is no certified mail return receipt in the record.  Plaintiffs allege that the presence of the Notice in the record is not sufficient to show that the Notice was mailed.  Defendants contend that the presence of the I-323 letter in the file is sufficient proof of service.  On at least some occasions, the Agency itself has found that the record failed to establish proper notice on an obligor where the record did not contain a domestic return receipt.  *See In re*

---

[39] Plaintiffs' "voluntary departure without the requirement of posting a bond" cannot succeed.  *See* discussion *supra* Part VI(C).

*Obligor*, 2003 WL 21000163 (INS Office of Admin. Appeals Feb. 11, 2003) ("The record fails

to contain the domestic return receipt to indicate that the Notice to Deliver Alien was sent to the

obligor . . . or to indicate that the obligor had received the notice to produce the bonded alien . . .

. Consequently, the record fails to establish that the district director properly served notice on the

obligor in compliance with 8 C.F.R. 103.5a(a)(2)(iv)."); *In re Obligor*, 2001 WL 34078453

(Office of Admin. Appeals Mar. 13, 2001) (same).  The Agency's Adjudicator's Field Manual

also requires that such a return receipt be included in the administrative record on appeal.  (Gov.

Appx. 058.)

The Agency argues that the presence of the letter in the file is sufficient to establish that it

was mailed and received, relying on *McCall v. Bowen*, 832 F.2d 862 (5th Cir. 1987).  In *McCall*,

the Fifth Circuit found that a factfinder could reasonably presume receipt of a letter sent by

certified mail in the absence of a return receipt where the Agency provided a copy of the letter

which was properly addressed, date stamped, and had the certified mail number written on it and

submitted an affidavit that the letter had been sent to that address by certified mail.  *Id.* 864.

Here, the Agency has not provided an affidavit that this particular notice was sent to the address

by certified mail, and there is no certified mail number written on the notice.  Moreover, the Fifth

Circuit has held generally that there is no general presumption of delivery for certified mail when

the return receipt is not received by the sender.  *See Mulder v. Comm'r of Internal Revenue,* 855

F.2d 208 (5th Cir, 1988) ("While it is presumed that a properly-addressed piece of mail placed in

the care of the Postal Service has been delivered, no such presumption of delivery exists for

certified mail when the requested return receipt is not received by the sender."); *see also Lundy*

*v. United States,* 2007 WL 655756, at *5 (S.D. Tex. 2007) (unpublished) (finding a "broad

judicial consensus on certified mail; specifically, that any presumption in favor of mailing or

delivery is destroyed when the sender cannot produce the return receipt.").  The Court therefore

finds that the Agency's determination that Plaintiffs were given proper I-323 notice of the breach was arbitrary and capricious because there is no rational relation between the facts found and the decision made.

Of course, failure to provide such notice does not result in cancellation of the bond, but instead just requires the initial breach to be declared unenforceable.  Plaintiffs' arguments that the bond must be cancelled because Ms. Hernandez was later granted voluntary departure without requirement of a bond cannot succeed.  *See* discussion *supra* Part VI(C).  Defendants Motion for Summary Judgment on this bond must be **DENIED.**  Plaintiffs' Motion for Partial Summary  Judgment is **GRANTED** to the extent that the bond breach is not enforceable.  This bond is **REMANDED** to the Agency for further consideration not inconsistent with this opinion.

### C.    Summary Judgment is Granted for Neither Party

#### 1.    Bonds That Are Moot

The Agency has cancelled the following bonds, and those bonds are therefore moot:

o   **Pinera-Gutierrez, Esmerana** (JSOF 2);
o   **Garcia-Portillo, Pedro Antonio** (JSOF 5);
o   **Yax-Chen, Bayron Joel** (JSOF 23);
o   **Mejia-Garcia, Elida** (JSOF 26);
o   **Benites-Reyes, Jose Rene** (JSOF 36);
o   **Hernandez-Ramos, Silvio Moises** (JSOF 46).

#### 2.    Bonds That Are Unenforceable

The Agency has also conceded that the following two bond breach determinations are unenforceable because the I-323 as to each notice was misaddressed.  The bonds are not cancelled, however, and these bonds are remanded to the Agency for further proceedings:

o   **Serrano-Lopez, Octavilla** (JSOF 48);
o   **Joya-Paz, Andrea del Carmen** (JSOF 50).

Neither party's motion is granted as to these bonds.

#### 3.    Omar Herrada, David (JSOF 34)

Plaintiffs argue that the Agency's refusal to cancel this bond is arbitrary and capricious because Mr. Omar Herrada voluntarily departed the country prior to the date the Agency breached the bond. Defendants counter that Plaintiffs have not provided valid proof of Mr. Omar Herrada's departure prior to the date of the breach.

The I-352 states that "Cancellation of a bond issued as a delivery bond shall occur upon any of the following, provided they occur prior to the date of a breach: . . . valid proof of the bonded alien's voluntary departure . . . ." I-352, General Terms and Conditions. Cancellation for said reason is "automatic" and "any subsequent appearance demand, or attempt to breach the bond, is null and void." *Id.* "If, however, the obligor fails to surrender the alien in response to a timely demand while the bond remains in effect, the full amount of the bond . . . becomes due and payable." *Id.* at G(1).

The facts of this bond are complicated. Plaintiffs appealed this bond breach in May 2004 alleging, *inter alia*, that Mr. Omar-Herrada departed the country on April 20, 2004, the day after his April 19, 2004 delivery date. (Jt. Appx. 474-475.) The AAO considered the relevant factors and rationally found that even if Mr. Omar-Herrada had departed on April 20, that departure occurred after the date of breach and was not, therefore, a valid defense to the bond breach.[40] (Jt. Appx. 480.) In October 2004, Plaintiffs filed a Motion to Reopen, this time alleging that Mr. Omar-Herrada had voluntarily departed the United States on October 23, 2003, which was prior to the delivery date. The AAO never decided the motion to reopen. It appears that as a part of the ADR process, the Agency produced a "Notice of Intent/Decision to Reinstate Prior Order" from Mr. Omar-Herrada's A-file dated March 18, 2005, which states that Mr. Omar-Herrada voluntarily departed the United States on October 30, 2003, prior to the delivery date, and illegally re-entered the country on or about March 18, 2005. (Jt. Appx. 461.) Despite the fact

---

[40] The AAO also noted that Plaintiffs had not attached a verification of departure to the appeal.

that the Agency relied on this document to find Mr. Herrada removable as an alien who has illegally reentered the United States, Defendants now claim that the document is hearsay within hearsay and a "self-serving statement by the alien recorded by a patrol agent, neither of whom is available for examination." (Defs.' Reply 29.) As part of the ADR process, Plaintiffs also produced a document, apparently completed by the Mexican Consulate in response to an inquiry from INS, stating that an individual with no ID but who claimed to be a Mexican national by the name of David Omar Herrada, DOB 5/19/1981, again left the United States on April 15, 2004. (Jt. Appx. 735-36.) Neither party has bothered to explain how Plaintiffs obtained this document or why this document was not part of Mr. Herrada's A-file.

Despite the fact that the Motion to Reopen was never decided, both parties seem to urge that the Court should now consider the merits of the bond. Defendants contend that, in the alternative, the Court should uphold the AAO's decision as rational. While it does appear that the AAO's decision was rational based on the record before it at the time, new evidence has emerged in the form of government documents and there is at least some question as to whether the record was complete at the time the Agency made its decision. As part of the ADR process, Defendants now claim that they would not have considered this evidence as valid proof of departure even if it would have been before them on a Motion to Reopen. The validity of that evidence seems to be a fact question particularly suited to the Agency's expertise and judgment. The Court is reluctant to review an informal Agency decision made during litigation, however. *See Pension Ben. Guar. Corp. v. Wilson N. Jones Memorial Hosp.*, 374 F.3d 362, 367 (5th Cir. 2004). In light of new evidence and given that there is still a Motion to Reopen pending before

the Agency, this bond is **REMANDED** to the Agency for consideration not inconsistent with this opinion.[41]  Neither party's motion is granted or denied.

## VIII.   CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED** as to bonds 1, 12, 13, 15, 16, 17, 37, 38, 39, 40, 41, 42, 43, 44, and 47.  The Agency's bond breach determination as to these bonds is **VACATED** and the bonds are **REMANDED** to the Agency for further consideration not inconsistent with this opinion. Because Bonds 4, 8, and 19 were settled, Defendant's Motion for Summary Judgment as to these bonds is **DENIED** and Plaintiffs' Motion for Partial Summary Judgment is **GRANTED**. Defendant's Motion for Summary Judgment is **GRANTED** as to bonds 3, 6, 7, 9, 10, 11, 14, 18, 20, 21, 22, 24, 25, 27, 28, 29, 31, 32, 33, 35, 45, and 49.  Because parties now agree that bond 30 was properly declared breached, summary judgment is also **GRANTED** for Defendant on this bond.  Neither party is entitled to summary judgment as to bonds 2, 5, 23, 26, 36, and 46, which are **MOOT**.  Neither party is entitled to summary judgment as to bonds 48 and 50, which have been found unenforceable and remanded to the agency for further consideration.  Finally, Defendant's Motion for Summary Judgment as to bond 34 is **DENIED** and the bond is REMANDED to the agency for further consideration not inconsistent with this opinion.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 24th day of March, 2008.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[41] The Court presumes that the relevant government documents are now part of Mr. Herrada's file and that the Agency will consider all of the relevant documents in making its decision.

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**