# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **SAFETY NATIONAL CASUALTY** | § | |
| **CORPORATION and** | § | |
| **AAA BONDING AGENCY, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO. H-05-cv-2159** |
| **v.** | § | |
| | § | |
| **UNITED STATES DEPARTMENT OF** | § | |
| **HOMELAND SECURITY,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court are the parties' Cross-Motions for Partial Summary Judgment on Nine Bonds (Doc. Nos. 147 and 148). After considering the Motions, all responses and replies thereto, and the applicable law, the Court holds that Plaintiffs' Motion should be granted in part, and Defendants' Motion should be granted in part.

## I.    BACKGROUND

This lawsuit involves a dispute regarding more than 1400 immigration bond breach determinations. The parties are various United States government entities, primarily the Department of Homeland Security ("DHS"), on one hand, and, on the other, Safety National Casualty Corporation ("Safety National"), a surety company authorized by the Department of Treasury to issue immigration delivery bonds; and AAA Bonding Agency, Inc. ("AAA"), Safety National's authorized agent. An alien may use an immigration delivery bond to procure his release from the custody of DHS's Bureau of Immigration and Customs Enforcement (ICE) pending the outcome of deportation

1

proceedings against him.  An immigration delivery bond is a contract, akin to a bail bond, between Safety National—acting through its agent AAA—and DHS.

Plaintiffs filed this action in June 2005 to challenge DHS's determination that a large number of bonds had been breached. Defendants then filed a counterclaim, demanding payment on 1,421 bonds. In September 2005, the parties established an Agreed Framework for Alternative Dispute Resolution ("ADR"). Later, the parties agreed to a stipulated Joint Statement of Facts (JSOF) for 50 bond breach determinations to be considered by the Court and compiled a Joint Appendix of the documents referenced in the JSOF. Plaintiffs identified 13 defenses they claimed were applicable to one or more of the 50 bonds and provided a list of those defenses to Defendants.  In March 2008, the Court addressed the 50 bond breach determinations and Plaintiffs' defenses and remanded 15 bond determinations to the DHS. (March 24, 2008 Mem. & Order ("March 2008 Order"), Doc. No. 113.) Each of the 15 remanded bonds was subject to one of two valid defenses: the "no-notice" defense and the "run letter" defense. Additional detail as to this Court's finding with respect to each of the 50 presented bonds can be found in the earlier opinion.

The Court held the "no-notice" defense valid because the I-352 Bond Contract ("Bond Contract" or "I-352") between the parties allows the obligor and the agent to provide an address and to check one of the following boxes: "Address to use for notice purposes: [ ] Obligor [ ] Agent [ ] Both." The Court determined that "[n]otice of a demand to deliver the alien is a condition precedent to performance, and proper notice, as defined by the terms of the Bond Contract, entails sending the I-340 [Notice to Deliver Alien ('I-340 Notice')] to both addresses." (March 2008 Order at 28.) The Court also

held that "[DHS] can only comply with its clearly expressed obligation to provide notice within 180 days by sending [the I-323 Notice of Breach ("I-323 Notice")] to both the obligor and the co-obligor if the 'both' box is checked." (*Id*. at 31.) The Court remanded 13 bonds based on the "no-notice" defense for failure to send either an I-340 and/or an I-323 Notice or both to both Safety National and AAA. (*Id*. at 51-52.) The Court also remanded an additional bond based on this defense because there was no certified mail return receipt indicating delivery of the I-323 Notice to either Safety National or AAA. (*Id*. at 55.)

As to the "run letter" defense, the Court determined that "the Bond Contract itself states unequivocally that no demand to produce an alien will be sent less than three days prior to sending [Form I-166 ('Run Letter')]. Under the clear language of the bond, where DHS fails to do so, it has not made a timely demand, and the bond has not been breached." (March 2008 Order at 41.) The Court remanded one bond because DHS sent the Run Letter on the same date as the I-340 Notice.

On remand, DHS re-issued the I-340 Notice by certified mail to Safety National and AAA for each of the 14 bonds. DHS did not provide the Run Letter at the same time as the I-340 Notice. After DHS received certified mail receipts confirming delivery of the notices, and neither obligor delivered the alien on the surrender date, DHS sent the I-323 Notice to Safety National and AAA via regular mail. Once the time for filing an appeal expired, DHS issued invoices demanding payment for each of the breached bonds. Plaintiffs did not pay these invoices. Subsequently, the Government sought judgment under the ADR framework on 14 of those remanded bonds. Plaintiffs moved for

summary judgment as to these 14 bonds, arguing that they had articulated valid defenses to DHS's breach determinations.

The Court then issued an Order granting the Defendants' Motion for Judgment in part. (May 11, 2009 Mem. & Order ("May 2009 Order"), Doc. No. 140.). In evaluating the defenses asserted by Plaintiff, the Court held that DHS's duty to provide notice does not require proof that the recipient received such notice. (May 2009 Order at 11.) The Court also reiterated that "[a] bond is not breached unless DHS sends an I-340 Notice at least three days prior to sending a Run Letter. (May 2009 Order at 14 (citing March 2008 Order at 41).) In applying this holding to the bonds at issue, the Court further clarified that, once a Run Letter is prematurely sent, that is, sent less than three days after the I-340 Notice, "the bell is rung . . . [and] the bond will forever remain unbreached." (*Id*.) In other words, the premature Run Letter defect is one that can "never be corrected." (*Id*.) The Court then remanded 5 bonds to DHS for further consideration not inconsistent with the Court's opinion. The Court granted the Defendants' Motion for Judgment as to the remaining 9 bonds, holding that these bonds were "due and owing unless Plaintiffs produce Run Letter for these aliens . . . within 30 days of entry of this Order." (*Id.* at 16.)

After these two orders were issued, the parties attempted to mediate their disputes by applying the Court's rulings to 241 additional bonds that the parties selected as a representative sample of the more than 2,400 bonds that remain in dispute. The parties were not, however, able to reach a final settlement through mediation due to continuing disagreements as to specific issues presented through the disputed bonds. Through cross-motions for summary judgment, the parties now present a discrete set of issues related to nine disputed bonds for this Court's determination. The parties agree as to three of the

4

issues to be adjudicated by this Court. Plaintiffs submit an additional two issues for this Court's determination that Defendants contend are improper and beyond the Court's jurisdiction. Accordingly, the Court will first take up the three issues that all parties agree are properly before it. It will then determine whether it has the authority to reach the two additional inquiries presented by Plaintiffs. The Court has jurisdiction pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 704, and 28 U.S.C. § 1345.

## II.    LEGAL STANDARD

### A.    Summary Judgment

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp*., 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id*. Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's

burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Cross motions for summary judgment do not alter the basic Rule 56 standard; instead the Court must determine whether either of the parties deserves judgment.

**B.      Agency Action**

As with its previous Orders, the Court will apply arbitrary and capricious review to DHS's bond breach determinations. 5 U.S.C. § 706(2)(A) (a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.") "[W]hile the arbitrary and capricious standard of review is highly deferential, it is by no means a rubber stamp." *Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*, 374 F.3d 362, 366 (5th Cir. 2004).   Agency action is entitled to a presumption of regularity, but "that presumption is not to shield [its] action from a thorough, probing, in-depth review." *Citizen to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 402 (1971).

**C.      Applicable Law[1]**

The I-352 is a contract, and the instructions on the form have been "incorporated into the section of the regulations requiring its submission."[2]   8 C.F.R. § 103.2(a); 8 C.FR. § 299.1; *see also* (I-352, General Terms and Conditions, Pl. Mot. Ex. A, Doc No.

---

[1] This standard has been reproduced from this Court's May 2009 Order.

[2] The Board of Immigration Appeals itself has explained that delivery bonds "create a contract between the Service, the bonding agent and attorney-in-fact, and the surety company." *Matter of Allied Fidelity Insurance Company*, 19 I. & N. Dec. 124, 125 (BIA 1984).  Defendants have not specifically argued in extensive briefing or at oral argument that its interpretation of the terms of the actual I-352 Bond Contract form is entitled to deference.  At least one Circuit has found that no such deference is owed to an Agency's interpretation of a contract. *See Meadow Green-Wildcat Corp. v. Hathaway*, 936 F.2d 601, 604-05 (1st Cir. 1991) (finding that "neither the language nor the reasoning" of Supreme Court cases discussing deference to agency interpretations of statutes or of its own regulations "suggests they require similar deference to DHS's interpretation of a contract that it makes with an outside party.").

147-1 ("Federal law shall apply to the interpretation of the contract, and its terms shall be strictly construed.").) The Court interprets contracts to give effective meaning to all terms, and assumes that no part of the agreement is superfluous. *See Medlin Const. Group, Ltd. v. Harvey*, 449 F.3d 1195, 1200 (Fed. Cir. 2006) ("The general rules of contract interpretation apply to contracts to which the government is a party. A reasonable interpretation must 'assure that no contract provision is made inconsistent, superfluous, or redundant.'" (internal citations omitted)); REST. (SECOND) OF CONTRACTS § 203(a), cmt. (b). Furthermore, "in choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." REST. (SECOND) OF CONTRACTS § 206; *see also Grumman Data Systems Corp. v. Widnall*, 15 F.3d 1044, 1048 n. 4 (Fed. Cir. 1994) (noting that the doctrine of contra proferentum "has been repeatedly applied in the field of government contracts.").

## III.   ISSUES THAT THE PARTIES AGREE ARE PROPERLY BEFORE THE COURT

### A.   Whether a Premature Run Letter Precludes Breach when the Run Letter was not Delivered

As summarized above, this Court previously held that, once a premature Run Letter is sent, the bell is rung, and the bond will forever remain unbreached. Defendants, in their Motion, ask the Court to revisit this holding in light of the practical considerations involved in holding that DHS can never determine a bond to be breached where a premature Form I-166 has been sent. DHS also asks us to hold that, where there is evidence that the alien did not receive the Run Letter, DHS can reissue demand notices, and, if the obligors cannot produce the alien, can then determine the bond has

been breached. In other words, Defendants ask this Court not to extend its holding regarding the "run letter" defense to cases where there is evidence that the Run Letter was not actually received by the alien. Plaintiffs argue that, because premature Run Letters preclude breach at the time they are sent, whether the alien actually received these letters has no effect on the invalidity of the breach determination.

First, this Court declines Defendants' invitation to revisit its prior ruling regarding premature Run Letters' preclusion of breach. In its March 2008 Order, the Court carefully considered the language of the Bond Contract and concluded that a timely demand is a condition precedent to Plaintiffs' performance, and therefore, where the agency fails to make a timely demand, the bond is not breached. (March 2008 Order at 41.) The Court went on to clarify that a prematurely sent Run Letter "rings the bell" such that the bond will forever remain unbreached. While the Court is mindful of the practical ramifications of such a holding, which Defendants raise in their Motion, the Court remains of the opinion that the language of the Bond Contract explicitly and unconditionally requires timely demand to produce an alien, which can only occur when the proper I-340 Notice is sent three or more days prior to the Run Letter. Any subsequent issuance of the I-340 Notice simply fails to meet this condition precedent because, once sent, the Run Letter bell cannot be "un-rung" and notice cannot be timely. Therefore, despite the practical considerations raised in Defendants' Motion, the Court will not revisit its ruling.[3]

---

[3] Defendants also argue that the Court should revisit this ruling because it is contrary to the language of the I-352, which does not limit DHS's ability to re-notice and render subsequent breach determinations based upon when a Run Letter had been previously sent. However, as the Court has held in each of its orders, proper I-340 Notice sent three days prior to the Run Letter is a condition precedent to Plaintiffs' performance under the Bond Contract. It is for this reason that the I-352 allows INS only to "send a new *timely* demand to produce an alien and then breach the bond again . . . ." (Pl. Mot., Doc. No. 147, Ex. A (emphasis added).) As the Court has noted, once the Run Letter has been sent, it is impossible for the INS

However, whether this ruling should apply in instances where there is evidence that the Form I-166 was not delivered is an issue not explicitly addressed by the Court's prior rulings. Among the nine bonds presented for adjudication in the Second Joint Appendix (Doc. No. 149), two files, and Morales-Morales and Hernandez-Ulloa bonds, contain I-166 forms, or Run Letters, which were returned to sender. In the case of the Morales-Morales Bond, the United States Postal Service ("USPS") stamp indicates three reasons as to why the forms could not be delivered: "Moved Left No Address"; "Attempted-Not Known"; and "No Such Street." (2nd JT APPX at 0062.) In the case of the Hernandez-Ulloa bond, the form appears to have been "Unclaimed." (*Id.* at 0089.) Defendants argue that, in these cases, where there is evidence that the alien did not receive the Form I-166, the Run Letter has had no impact in terms of creating a risk that the alien would run. Therefore, argues Defendants, DHS should be permitted to reissue proper demand notices and then determine that the bond has been breached if the obligor fails to produce the alien. Plaintiffs, however, maintain that the validity of the breach determination should not turn on whether the Run Letter has actually been received because, under the terms of the Bond Contract, it is the sending of the Run Letter that prevents DHS from holding a bond in breach.[4]

---

to reissue an I-340 Notice that is timely. Therefore, Plaintiffs' obligation to perform never arises, and the bond cannot be breached. The Court's holding, therefore, is in no way contrary to the language of the I-352, which provides that only timely notice can be reissued.

[4] The Court notes that the two parties present this issue in different ways. Plaintiffs' argument appears to focus on the fact that premature Run Letters, meaning those that are sent less than three days after an I-340 Notice is sent, can preclude breach even where the Run Letter is returned as undeliverable. Defendants' Motion, on the other hand, notes that for the two bonds actually before the Court, Run Letters were sent well beyond three days after the I-340 Notices were sent. The defect in these Notices was that they were not sent to both Safety National and AAA, as the Court has held is necessary in cases were the "Both" box is checked on the Bond Contract. The parties therefore, advocate for their positions with respect to different kinds of notice defects: the "run letter" defense and the "notice to both" defense. However, neither party raises this distinction in their briefs, even in response to the other's position. As such, the Court will assume that its holding will apply in cases of both types of defects, although the Court notes that the issue before it

In its March 2008 Order, the Court noted that the Bond Contract states that "no demand to produce the bonded alien for deportation/removal shall be sent less than three days prior to sending notice to the bonded alien." (I-352, General Terms and Conditions, Pl. Mot. Ex. 1; March 2008 Order at 41.) The Court interpreted this provision as an apparent acknowledgment within the Bond Contract that the Run Letter creates a risk that the recipient alien will leave town before the date of delivery or deportation. (*Id.*) The Court once again implicitly recognized this risk in its subsequent conclusion that the Run Letter bell could not be "un-rung." (May 2009 Order at 14.) Logically, then, once a Run Letter is sent, this risk recognized by the Court that the alien might flee cannot be cured with a subsequent, albeit properly issued, demand notice.

However, this Court agrees with Defendants that this rationale carries considerably less practical weight in instances where DHS can offer evidence that the Run Letter was never received, that is, that the risk of alien flight never materialized. In addition, the Court also notes that allowing reissuance of demand notices for the two bonds now before it is materially distinct from requiring Plaintiffs, in order to invoke the Run Letter defense, to show that the Run Letter was actually received in every instance. Such a holding would, in essence, place the burden on the Plaintiffs to show actual prejudice from the premature Run Letter, an argument which has been squarely rejected by this Court. (March 2008 Order at 41.) The holding sought by Defendants, by contrast, allows DHS to come forward with evidence that affirmatively demonstrates that the Run Letter was not received, and therefore that the Run Letter risk never materialized.

---

in the form of actual disputed bonds is whether undeliverable I-166 forms sent after a failure to provide proper I-340 Notice precludes these bonds from ever being breached.

Despite these acknowledgments, however, the Court is unpersuaded by Defendants' argument. Defendants' position places determinative weight upon the practical considerations surrounding Run Letters that admittedly appear to have contributed to the Bond Contract's language. However, the fact remains that the explicit contractual language conditions proper notice upon its temporal proximity to when the Run Letter was *sent.* As the Court has stated before, this language creates a condition precedent to Plaintiffs' performance. A failure to satisfy an explicit condition precedent on the part of DHS cannot be cured by the fortuitous inability of the USPS to deliver the Run Letter. That a Run Letter has been sent without proper I-340 Notice being issued means that the terms of the Bond Contract have not been observed, and therefore that breach is precluded. The Court must, therefore, reject Defendants' attempt to disregard the contractual language in the name of practical concerns.

Moreover, in looking beyond the two bonds now presented to us for consideration, the Court notes that Defendants' proposed rule, which is based on the presumption that, if the Run Letter is returned then the alien never received notice of it, necessarily creates a fact inquiry in every instance in which the I-166 form is returned as undeliverable. Defendants' position, by their own admission, has merit only in circumstances in which it can be readily determined that the alien never received notice of the Run Letter. Implementation of this position therefore requires, in all future instances of undelivered forms, an inquiry into whether the alien in question actually never received the I-166 form, or whether he or she learned of its contents, and, knowing that deportation was imminent, deliberately left the form unclaimed while fleeing.

Defendants point out that this speculative argument is based only on conjecture, as the bonds now before the Court demonstrate that the Run Letters were not deliverable for multiple reasons, none of which is that the letter was "Refused." Absent such a designation, argue Defendants, there is no basis upon which to suppose that the Run Letter was rejected by the alien after its contents became apparent. The Defendants' argument, however, concedes that their position would be subject to an exception for cases in which the USPS checks the box "Refused" as the reason for non-delivery.  In such cases, there is a strong suggestion that the Run Letter was deliberately rejected by the intended recipient, who learned of its contents prior to refusing it. A holding that would require such a fact intensive inquiry, and would place such determinative significance upon how a USPS worker chose to mark a label as a presumptive proxy for whether the alien actually received the Run Letter, seems, to this Court, to be an impractical and somewhat arbitrary approach to evaluating bond breach determinations. Moreover, although the "Refused" scenario is not now before it, the Court is nonetheless mindful that its opinions as to these nine specific bonds are to be used to resolve disagreements as to thousands of bonds that remain in dispute between the parties. In light of the amount of time and energy which has already gone into resolving these disputes, the Court is extremely reluctant to issue a ruling that might generate more uncertainty in the future and might require it to resolve additional disagreements which arise between the parties in inevitable cases where the "Refused" box is checked. Instead, the Court will adhere to the explicit terms of the Bond Contract, which focus on when the Run Letter was sent.

Therefore, the Court concludes that Run Letters sent less than three days after proper notice of demand renders the bond forever un-breached, even if the Run Letter is later returned to sender as undeliverable. Accordingly, summary judgment is granted in favor of Plaintiffs as to the Morales-Morales and Hernandez-Ulloa bonds. These bonds cannot be breached in the future.

**B.      Whether a Single Notice is Proper when Safety National/AAA List the Same Address on the Bond Contract**

The second issue presented to the Court is whether, when the I-352 bond lists only one address for both the agent and the obligor and the "Both" box is checked for purposes of notice, DHS may validly send just one notice to that single address. Defendants point out that the I-352 form allows Plaintiffs to select which "address" to be used for notice purposes, and not which "obligor" should receive notice. Thus, according to Defendants, in cases where the agent and obligor's address is the same, Defendants' duty is discharged by sending notice to only the single address reflected on the form, regardless of which box is checked.

This Court's previous orders make it clear that, in cases where the addresses provided on the I-352 for the obligor and the agent are different and the "Both" box is checked, DHS must send notice to both obligor and agent.[5] As an initial matter, therefore, the Court finds it difficult to accept the proposition that, in cases where the addresses for the agent and obligor are listed separately but are the same in substance, DHS is thereby

---

[5] Defendants ask the Court to revisit its prior conclusion that Safety National and AAA are not required to establish prejudice based upon the failure of DHS to send requisite notice to both parties. Defendants maintain that the facts before the Court establish that, in almost all such cases, either Safety National or AAA had actual notice of the demand, and that Plaintiffs cannot legitimately argue that they were not properly informed of their obligation to produce the alien. The Court, however, previously rejected this argument because it found that notice to both parties is actually a condition precedent to Plaintiffs' performance under the Bond Contract. (March 2008 Order at 29-30.) Therefore, regardless of whether Plaintiffs suffer prejudice, their obligation to perform does not arise unless proper I-340 Notice is provided to both obligor and agent. Defendants have not persuaded this Court that this reasoning should be revisited.

given license to dispose with notice to one of the recipients altogether. Indeed, in such cases, the selection of "Both" would be rendered entirely meaningless.

The parties have presented two sample bonds that raise this issue, the Cerda-Rivas bond and the Ajpuac-Machan bond. The I-352 forms contained in these files reflect addresses for AAA and Safety National which are materially identical, but are listed separately. (2nd JT APPX at 003, 014.) Notably, the instructions next to the space for the agent address indicate that the address need only be filled out "if it is different from that of Obligor." (*Id.*) Therefore, that addresses are listed separately for AAA and Safety National is necessarily a signal that the address as associated with the obligor is somehow different from the address as associated with the agent. This strikes the Court as entirely logical, as an address attached to one recipient's name necessarily reaches a destination that is distinct from an address listed next to an entirely different recipient's name, because the ultimate possessor of the mail in each case is different. Logically, then, listing an address twice on the I-352 form, but associating the address with different parties in a manner that indicates that one listing is different from the other, clearly signals that notice should be sent to the listed address as associated with both agent and obligor in order to effectuate the checked "Both" box.

Morever, Defendant's position ignores the fact that the underlying purpose of the I-352 form's inquiry as to the appropriate address is that of notice. In construing the term "address," therefore, the intended recipient of the form in question cannot be ignored. If, for example, the addresses listed for the obligor and the agent on the I-352 form were the same, and the "Obligor" address box was checked, one could not logically comply with the form's instructions by sending notice to the appropriate address but listing the

intended recipient of the envelope to be the agent. In other words, it can hardly be said that, by addressing an envelope with the address listed for Safety National, but indicating that the intended recipient of the envelope is AAA, the Government is in fact providing notice to Safety National. Similarly, if, as is the case here, addresses are listed separately for the Safety National and AAA and the "Both" box is checked, one cannot provide valid notice by sending notice to the address that is indicated for both parties, but indicating that one party, to the exclusion of the other, is to be the intended recipient of the package.  Under the Defendants' interpretation of the form, however, the intended recipient of the form is irrelevant, as it is only the physical address which matters for purposes of notice compliance. This argument is simply illogical.

This Court therefore holds that in cases where the address listed for obligor and agent is the same and the "Both" boxed is checked, DHS must send notice to the listed address as associated with both obligor and agent in order to provide proper notice. Indeed, this holding is also consistent with this Court's previous holding in the March 2008 Order that "the Bond Contract requires the Agency to provide notice of a demand for delivery to both obligor and agent *if an address is provided for both* on the bond form . . . ." (March 2008 Order at 28 (emphasis added).) Regardless of whether the address associated with the obligor and agent is the same, therefore, notice must be provided to both.[6]

---

[6] Defendants argue that the Court previously addressed this issue by implication in the March 2008 Order when deciding whether a bond was properly breached where notice was returned to sender as undeliverable. In considering the bond at issue there, the Court did acknowledge that the address provided for Safety National and AAA was the same, and that both the I-340 form and the I-323 form were sent to that address. (March 2008 Order at 47.) The Court ultimately upheld the breach determination as to this bond. However, the Court was not, at that time, faced with the question of whether Defendants had provided proper notice to both Safety National and AAA in that instance, and thus it did not comment on it. The Court will not construe its previous silence as to this issue as a conclusive holding that the "notice to both" defense did not exist in that instance, as the Court was not squarely faced with the issue at that time.

The Court would like to note, however, that it holding should not be interpreted to place any significance on the number of copies that are sent to the address listed. That is, if DHS were to send only a single notice form to the address listed on the I-352, but were to name the intended recipient as *both* AAA and Safety National, their notice obligations would be discharged. In such cases, notice is provided to the listed addresses as associated with both intended recipients, thereby fulfilling the requirements of the checked "Both" box. Defendants are therefore correct that DHS has no obligation to mail two separate notices to one address, provided that the address on the single notice is associated with both obligor and agent as instructed by the I-352 form. Accordingly, this Court holds that, when the same address is listed separately for both Safety National and AAA and the "Both" box is checked, notice must be sent to the listed address as associated with both parties, regardless of whether one or two copies of the notice are ultimately mailed out.  Judgment is therefore granted in favor of  Plaintiffs as to the Cerda-Rivas bond and the Ajpuac-Machan bond, as DHS did not provide proper notice of demand in these instances.

**C.      Whether Plaintiffs Waived the "Notice to Both" Defense in Prior Motions to Reopen or Reconsider**

In its March 2008 Order, this Court held that "[t]o the extent that Plaintiffs are appealing the Agency's decision on a Motion for Reconsideration ["MTR"] or a Motion to Reopen, issue exhaustion does appear to be required by regulation.  However, it may have been futile for Plaintiffs to raise many of the defenses asserted in this lawsuit. *See McCarthy v. Madigan*, 503 U.S. 140, 147 (1992); *Hormel v. Helvering*, 312 U.S. 552, 557 (1941)." (March 2008 Order at 17.) The Court further noted that the Court would address the futility argument on a case by case basis. (*Id.*)

Defendants argue that, in the cases of two bonds presented to the Court, the Bueno bond and the Gutiererz-Mejia bond, Plaintiffs filed an MTR with the DHS Field Office Director without raising the defense that notice was not sent to both addresses specified on the Bond Contract (the "notice to both" defense), thereby waiving any such defense at the judicial review stage. Plaintiffs argue that this defense was appropriately raised because they stated in their MTR that the INS "did not give the requisite notice to the obligors, AAA Bonding Agency, Inc. and Safety National Corporation." Plaintiffs further argue that, even if the Court finds that the defense was not raised, it would have been futile to do so.

### 1. Was the "Notice to Both" Defense Raised?

First, the Court holds that Plaintiffs did not adequately raise the defense at issue in their MTR. As Defendants point out, the MTRs submitted for both bonds at issue use materially identical language to state the grounds on which Plaintiffs believed that the Field Office Director should overturn the bond breach determination. (2nd JT APPX 0140-141, 0171-0172.) Taking this language in context, it is clear to the Court that the defense being raised by Plaintiffs was the failure by DHS to send a questionnaire with the I-340 Notice, which this Court rejected in its previous order as a valid defense to a bond breach determination. (March 2008 Order at 43.)

Plaintiffs argue that, for purposes of exhaustion, it is sufficient that Plaintiffs complained in their MTRs of improper notice; according to them, the basis of the impropriety is of no significance. The Court, however, cannot adopt this position. This Court has spent a significant amount of time exploring and evaluating the myriad of defenses to bond breach determinations that have been raised by Plaintiffs, many of

which are based on notice. To hold in this case that, by arguing any one of the noticed-based defenses in their MTR, Plaintiffs have preserved each and every notice-based defense on judicial appeal would, in essence, exempt Plaintiffs from the exhaustion requirement to a significant degree. Accordingly, the Court rejects Plaintiffs' argument and holds that, for the Bueno and Gutiererz-Mejia bonds, Plaintiffs did not raise the "notice to both" defense in the MTRs submitted to the DHS Field Office Director.

### 2.      Would the "Notice to Both" Defense have been Futile?

This conclusion, however, does not end the inquiry. The Court must also determine whether raising this defense would have been futile, a recognized exception to the administrative exhaustion requirement. Plaintiffs argue that it would have been futile to raise the "notice to both" defense because DHS has an established record of rejecting that defense out of hand prior to this Court's March 2008 ruling. Defendants, on the other hand, argue that Plaintiffs' futility argument must fail because they have not presented any evidence that they or any other appellant have ever raised the "notice to both" defense in an MTR for a Field Office Director's decision.

In the context of appeals from administrative proceedings, the requirement that all claims be exhausted at the administrative level can only be waived under "exceptional circumstances." *Comm'ns Workers of Am. v. AT&T Co.*, 40 F.3d 426, 432 (D.C. Cir. 1994). With specific regard to futility, circuits have held that this exception to exhaustion applies only when an adverse decision is certain. *Id.*; *see also Bourgeois v. Pension Plan for Employees of Sana Fe Int'l Corp.*, 215 F.3d 475, 479-80 (5th Cir. 2000) (applying the standard for the futility exception laid out by the D.C. Circuit); *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003) (an argument that is likely to fail is not tantamount to futility,

as raising the argument may still serve the purposes of the exhaustion requirement); *Smith v. Blue Cross & Blue Shield United of Wisconsin*, 959 F.2d 655, 659 (7th Cir. 1992) (noting that the futility exception requires plaintiff to show that the claim certainly would have been denied on appeal, not merely that there is doubt as to whether appeal would have resulted in a different decision).

Here, the Court cannot find that Plaintiffs meet the high bar set for the futility exception. As Defendants observe, Plaintiffs point only to the fact that Administrative Appeal Office (AAO) decisions had, until this Court's March 2008 Order, uniformly held that notice sent to one joint and several obligor was sufficient "notice to both." Because the DHS Field Office Director, to whom MTRs are submitted, has the authority to overturn AAO decisions, Plaintiffs' argument fails to establish that the "notice to both" argument would have certainly been rejected had it been raised in an MTR. That the Field Office Director may adopt a different position from that of the AAO is precisely the reason why appeals are made to it.

As such, Plaintiffs' argument that Defendants are unable to point to a single AAO decision that has upheld the "notice to both" defense in a bond breach decision misses the mark. Even if the Court were to accept the proposition that the AAO would certainly have rejected the "notice to both" defense, it is Plaintiffs' burden to demonstrate that the DHS Field Office Director, in considering an MTR, would have certainly adopted such position. Given the Field Office Director's inherent authority to reach decisions different from those of the AAO, Plaintiffs' argument must fail. Notably, Plaintiffs do not point to a single Field Office Director position that has held the "notice to both" defense to be invalid, which would have made their futility argument considerably stronger.

As Defendants point out, Plaintiffs have relied on the Field Office Director's power to reach a different conclusion from the AAO as to other bond breach defenses. They could and should have done the same with respect to the "notice to both" defense. Accordingly, this Court finds and holds that Plaintiffs have waived the "notice to both" defense for the Bueno bond and the Gutiererz-Mejia bond. Summary Judgment is granted in favor of Defendants as to this issue.

## IV.     ISSUES AS TO WHICH THE PARTIES DISPUTE JURISDICTION

There are two additional questions that Plaintiffs present for resolution by this Court. Defendants contend that neither of these issues is properly before the Court because it lacks jurisdiction to adjudicate them. The Court will take up each of these issues in turn, and first make a determination as to whether it may reach the merits of the presented question.

### A.     Whether Premature Run Letters Preclude Breach Even if not Issued on a Form I-166 ("Home Grown Run Letters")

Defendants challenge this Court's jurisdiction over the issue of "Home Grown Run Letters" on the basis of the fact that the bond that Plaintiffs present to raise this issue, the Guerra-Godoy bond, is not among the 1,421 bonds within the litigation pending before this Court. Defendants asserted counterclaims for the amounts due only as to 1,421 bonds that DHS held in breach, and therefore, argues Defendants, have not waived immunity as to the Guerra-Godoy bond. Defendants also point out that the Guerra-Godoy Bond was not breached until after the Plaintiffs filed their Complaint with this Court and, therefore, could not be encompassed within Plaintiffs' claims. Because Plaintiffs cannot point to a single bond within this litigation that presents the issue of "Home Grown Run Letters," Defendants argue that this Court cannot reach the merits of this issue. In

response, Plaintiffs argue that Defendants necessarily waived immunity as to the Guerra-Godoy Bond because, for purposes of sovereign immunity, this bond constitutes the same "transaction or occurrence" as the 1,421 bonds that are properly before this Court. *See Frederick v. United States*, 386 F.2d 481, 487-89 (5th Cir. 1967).

Even if this Court were to agree with Plaintiffs that the same transaction and occurrence test is met for purposes of sovereign immunity, Plaintiffs' argument fails to address the fact that the bond at issue, the Guerra-Godoy Bond, was not declared in breach until November 15, 2007, well after the controlling Complaint in this litigation was filed. Plaintiffs' Complaint, therefore, cannot encompass this bond. That this bond was one of the more than 2,400 bonds over which the parties attempted to mediate using this Court's prior orders cannot subject to this Court's jurisdiction bonds as to which disputes did not arise until after the Complaint and counterclaims were filed. Plaintiffs argue that their pleadings "reach all bonds for which the disputed defenses apply" because this litigation has always been about "which defenses are valid." (Pl. Br., Doc. No. 151, at 9.) It is true that this Court has strived, through its orders, to create clarity regarding defenses as to any bond breach determinations made by DHS. The Court rendered opinions as to these defenses by considering 50 bonds brought before it as a representative sample of the 1,421 within this suit. However, what the parties are now apparently contesting is the application of this Court's holdings to the circumstances surrounding a particular bond that was neither included in the 1,421 bonds in Defendants' counterclaim, nor represented by the 50 bonds on the basis of which this Court issued its rulings. Because the disagreement as to this particular bond, and the issues presented

therein, arose after the scope of this litigation had been defined, the Court cannot now render a judgment on this dispute.

If this Court were to adjudicate the particular issue now presented to it by Plaintiffs, it would, in essence, be issuing an advisory opinion over a conflict that has not been properly brought before it under the Federal Rules of Civil Procedure, in direct violation of its constitutional mandate. While this Court regrets leaving any uncertainty as to the issues that continue to divide these parties, as history has shown that agreement in the face of uncertainly is all but impossible in this case, the goal of resolving the remaining disputes cannot trump the jurisdictional bounds of this Court.  Accordingly, because there is no actual case or controversy properly before the Court, it cannot reach the merits of the question of whether premature Run Letters issued on something other than an I-166 form can preclude breach.

### B.    Whether Plaintiffs are Entitled to Offsets and Credits for Amounts Paid but not Due

Plaintiffs argue that, over the years, they have paid DHS for bonds that were not, under the Court's prior rulings, properly held in breach, which now entitles them to offsets and credits to the amounts they owe DHS for legitimately breached bonds. As with the previous issue, Defendants argue that the issue of offsets is not properly before the Court, because the United States has not waived sovereign immunity as to this independent claim.

### 1.    Jurisdiction

The Fifth Circuit has held that "when the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment arising out of the same transaction or occurrence which is the subject matter of the government's suit." *Frederick*

*v. U.S.*, 386 F.2d 481, 488 (5th Cir. 1967).  However, the Government does not waive suit as to affirmative actions, or those "involving relief different in kind or nature to that sought by the government" or "exceeding the amount of the government's claims." *Id*. The Government argues that, when Plaintiffs paid the amounts due under the Luciano-Da Silva and Paulino-De Godoy bonds presented to the Court to raise Plaintiffs' claim for offsets, they mooted Defendants' demands for those debts, thereby foregoing their opportunity to mount a defense to payment. Plaintiffs argue that their claim for offsets and credits is essentially a defense for the amount sought by the Defendants as to all outstanding bonds. According to Plaintiffs, this claim therefore meets the same transaction and occurrence test set forth in *Frederick*. Plaintiffs further argue that, because they do not seek an affirmative recovery above and beyond the amount sought in DHS's counterclaim, such a claim is not barred by sovereign immunity.

The Court is persuaded that Plaintiffs' claim for offsets and credits, as it is alleged here, is indeed a defense to the entire amount which the Defendants allege is due and owing in their counterclaim. Accordingly, the defense is, as Plaintiffs argue, akin to a recoupment claim. DHS has waived sovereign immunity to the extent that Plaintiffs seek to defeat or reduce the claims that DHS asserts in this case, and this Court may therefore evaluate the merits of Plaintiffs' defense. Furthermore, Plaintiffs do not seek an amount in credit that exceeds the total amount asserted by Defendants in their counterclaim. As such, Plaintiffs' argument does not run contrary to the holding of *Frederick*. This Court may, therefore, properly assert jurisdiction over this issue.

### 2.     Were These Payments Made Voluntarily?

Defendants argue that, even if Plaintiffs had a jurisdictional basis for their offset claim, the claim is barred by the voluntary payment doctrine. Voluntary payments made as final settlement of debts cannot be recovered, even if the debts were not legally due at the time of payment. *Genesis Ins. Co. v. Wausau Ins. Cos.*, 343 F.3d 733, 736 (5th Cir. 2003). This rule applies with equal force to payments made to the federal government. *United States v. Edmondston*, 181 U.S. 500, 510-11 (1901).

Plaintiffs argue that the payments made to Defendants in fulfillment of the improperly breached bonds were made under "duress or business compulsion" and were therefore not voluntary. A payment under duress can be recovered because it is not considered voluntary if made because of the wrongful acts or threats of the payee government. *Employers Ins. of Wausau v. U.S.*, 764 F.2d 1572, 1575-76 (Fed. Cir. 1985) (citations omitted.) Here, Plaintiffs claim that they were under duress when the debts owed under the Luciano-Da Silva and Paulino-De Godoy bonds were paid because Plaintiffs reasonably believed that Defendants would carry out their threat of decertifying Safety National as an approved Government surety unless the bonds were paid.

The Court, however, is unpersuaded by Plaintiffs' argument. First, the defense of duress requires Plaintiffs to establish three elements: (1) one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the coercive acts of the opposite party. *Wausau*, 764 at 1576. In *Wausau*, the Federal Circuit rejected the argument that an agency's threat to request decertification of a surety company by the Department of Treasury constitutes duress. *Id*. There, the court noted that the plaintiff had an alternative to immediate payment even in the face of such a threat, such as requesting delay. *Id*. The court further reasoned that,

because surety companies are not "easily pushed around," a statement of intention by the Government to seek a remedy that that the law provides is not duress. *Id*. Similarly, in this case, because DHS has every legal right to request decertification, the Court is not persuaded that the threat to exercise this right constitutes duress. Although Plaintiffs allege that DHS improperly invoked this right in order to coerce payment from Plaintiffs, and that the proceedings before the Department of Treasury were tainted by improper ex parte contacts, the Court cannot conclude that payment of these bonds was the only remedy available to Plaintiffs to avoid or oppose decertification, or that the threat of decertification was *per se* coercive.[7]  Indeed, as Defendants point out, this case has been ongoing for five years precisely because there remain hundreds of unpaid bonds still in dispute between these parties. Plaintiffs clearly did not feel so coerced, and continue to assert defenses, with respect to several hundred bonds which remain in dispute.

Secondly, the circumstances under which the Luciano-Da Silva and Paulino-De Godoy bonds were paid strongly counsel against a finding of duress. These two bonds were among the 10 submitted by DHS to the Department of Treasury to demonstrate Safety National's delinquent payment history during the decertification process. According to DHS, although Plaintiffs presented defenses and withheld payment on several of the bond debts submitted to the Department of Treasury, it presented no such defenses for the two bonds now at issue. (Def. Br., Doc. No. 152, at 7, Ex. B.) Instead,

---

[7] Plaintiffs also argue that their entitlement to monies paid on bonds that were wrongfully declared breached has been recognized in the past. First, Plaintiff point to *Int'l Fid. Ins. Co. v INS*, No. EP-87-CA-28-H (W.D. Tex. June 25, 1980), in which the Court ordered INS to refund money paid by the plaintiff surety on bonds for which the alien had voluntarily departed. However, the facts of that case are materially distinct from those presented here, because it seems from the language of the order that evidence of the alien's voluntary departure under each of those bonds was not uncovered until after the bonds were paid. (*See* Pl. Br. Doc. No. 155, Ex. B.) Plaintiffs also point out that DHS has previously provided offsets to sureties as part of overall settlement agreements of bond disputes. That Defendants have voluntarily provided these offsets, however, is inapposite to the determination of whether Plaintiffs are entitled to these offsets as a matter of law in this instance.

Plaintiffs made partial payments on these two bond debts on July 29, 2005. Full payment on these bonds was not made until 2006, after DHS filed its counterclaim to collect all remaining balances with this Court. As such, it is undeniable that Plaintiffs chose to make payments on these two bonds even as they were asserting defenses to other bond debts presented to the Department of Treasury during the decertification process and raised by Defendants' counterclaims in this litigation. This timeline strongly suggests that Plaintiffs were not under duress, or without alternatives, when they chose to make these payments such that their actions can be deemed involuntary. Indeed, in a letter to the Department of Treasury dated October 26, 2006, counsel for Plaintiffs explicitly states that Plaintiffs were tendering payment for the amount owed on the bonds involved in the Treasury proceeding "as a showing of good faith." (Pl. Br., Doc. No. 154, Ex. A.) Such language certainly does not connote that this payment was being coerced or made as a last option.

Therefore, because Plaintiffs voluntarily made payments to Defendants for the Luciano-Da Silva and Paulino-De Godoy bonds, Plaintiffs are not now legally entitled to recover these amounts in the form of offsets and credits. Summary Judgment as to this issue is accordingly granted for Defendants.

## V.   CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 147) is **GRANTED IN PART**. Four bonds—the Morales-Morales, Hernandez-Ulloa, Cerda-Rivas, and Ajpuac-Machan bonds—are hereby remanded to DHS for action not inconsistent with this Order. Defendants' Motion for Partial Summary Judgment (Doc. No. 148) is also **GRANTED IN PART**. Payment for two bonds—the Bueno and Gutiererz-Mejia bonds—is now due.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 28th day of May, 2010.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE